Louis J. ZEBEDEO

v.

MARTIN E. SEGAL COMPANY, INCORPORATED.

Civ. No. H–78–664.

United States District Court, D. Connecticut.

March 23, 1984.

Igor I. Sikorsky, Jr., Diane M. Sikorsky, Sikorsky & Sikorsky, Hartford, Conn., for plaintiff.

James Frank, Simpson, Thacher & Bartlett, New York City, Robert M. Bourke, Gager, Henry & Narkis, Hartford, Conn., for defendant.

## MEMORANDUM OF DECISION

CLARIE, Senior District Judge.

In this action tried to the Court, the plaintiff, Louis J. Zebedeo ("plaintiff" or "Zebedeo"), a member of the protected age category, alleged that the defendant, Martin E. Segal Company, Incorporated ("the Company" or "defendant") violated the Age Discrimination in Employment Act, ("ADEA") 29 U.S.C. § 621 *et seq.* He claims that the defendant failed to renew his written contract of employment as of March 31, 1978, on the basis of his age, and has subsequently retaliated against him for filing a complaint under the ADEA's provisions, by discriminatorily enforcing his non-competition agreement with defendant. While the Court finds that the plaintiff has successfully demonstrated a prima facie

1. The 1978 Amendments to the ADEA, Pub.L. 95–256 § 2, 92 Stat. 603, became effective April

case on both issues, he has failed to bear his ultimate burden of persuasion. Therefore, the Court finds for the defendant on all issues presented in this case.

### Findings of Fact

1. Plaintiff brings this individual action pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, Pub.L. 90–202 § 2 (1967), 81 Stat. 602 ("ADEA").[1]

2. Plaintiff alleges that the defendant failed to renew his written employment agreement on March 31, 1978 on the basis of age and has subsequently retaliated against him for pursuing remedies under the ADEA by threatening to enforce the non-compete provisions included in his agreement with defendant.

3. Plaintiff, Louis J. Zebedeo, whose date of birth is August 10, 1921, was a self-employed independent consultant to Taft-Hartley benefit plans for employers within the State of Connecticut prior to 1968.

4. Defendant, Martin E. Segal Company, Incorporated, is a New Jersey corporation and a wholly-owned subsidiary of Martin E. Segal Company. Defendant has offices in Boston, Massachusetts and Hartford, Connecticut which together comprise the New England Region of the Martin E. Segal Company. Defendant is engaged in providing consulting and actuarial services to Taft-Hartley benefit plans.

5. From April 1, 1968 to March 31, 1978, plaintiff was employed by defendant in the executive position of Vice-President and Manager of the defendant's Hartford, Connecticut office pursuant to successive written and terminable employment contracts.

6. Plaintiff's employment was exclusively in the Hartford office which is part of, and under the supervision of, the New England Regional office. Sherman G. Sass ("Sass") was a Senior Vice-President of

6, 1978 and are not applicable herein.

Martin E. Segal Company and the Regional Manager of the New England Region. He was plaintiff's immediate superior. Sass was born on December 22, 1926 and has been employed by the defendant for 18 years. (Defendant's Exhibits BQ at p. 6 and BR).

7. Plaintiff also had direct reporting responsibilities to the National Office of Martin E. Segal Company which was established in 1972 and which functions separately from the New York office of Martin E. Segal Company.

8. Vincent O'Hara ("O'Hara") was President and Chief Executive Officer of Martin E. Segal Company in late 1976 and throughout 1977. He was born on September 26, 1918 and had been employed by Martin E. Segal Company for 26 years. Currently, O'Hara is Vice-Chairman of Martin E. Segal Company.

9. James R. Gunning ("Gunning") is a Senior Vice-President of Martin E. Segal Company and its chief financial officer. All of the defendant's senior management personnel were in the protected age category in 1978, as were 30 of its 46 branch managers and officers. (Defendant's Exhibit BR). There was no evidence presented which would indicate a plan or policy to retire those officers and managers prematurely.

10. Effective April 1, 1968, plaintiff entered into a written contract ("1968 Agreement") with defendant whereby he agreed to enter the employ of defendant and merge his business and 14 clients into the defendant's business. (Plaintiff's Exhibit 5 and Exhibit A attached thereto).

11. As manager of the Hartford office, plaintiff has responsibility for the day-to-day operation of the office, staff training, client development and profitability of the office.

12. Under the terms of the 1968 Agreement either party could terminate the Agreement on 90 days' written notice. (Plaintiff's Exhibit 5 at ¶ 3). Plaintiff was paid a base salary of $20,000 per year. (Id. at ¶ 5(a)). Plaintiff was also entitled to a specifically defined level of profit sharing and insurance, which benefits were to be

paid over a ten-year period. (Id. at ¶¶ 5(b)–8). The 1968 Agreement also provided that plaintiff could withdraw from the relationship within the first year without penalty. (Id. at ¶ 11). After that period, the 1968 Agreement provided that if plaintiff elected to continue the relationship, the clients identified in Exhibit A to the Agreement as having been brought in with plaintiff would become clients of the defendant. Plaintiff also acknowledged receipt of defendant's trade secrets and agreed to be bound by the non-compete provisions of the Agreement which, in essence, provided that during his employment and for five years thereafter he would not divulge any trade secrets or seek an affiliation with an entity in competition with the Company. (Plaintiff's Exhibit 5 at ¶¶ 9, 12 and 13).

13. In September 1969, plaintiff sought to renegotiate the terms of the 1968 Agreement to provide for a long-term relationship and enhanced economic benefits for himself. (Defendant's Exhibit AF). Thereafter, plaintiff and defendant had negotiations on the matter.

14. Plaintiff fully understood the non-compete provisions of the 1968 Agreement prior to the signing of the Agreement. (See Defendant's Exhibit AE). During the 1969 negotiations, plaintiff demonstrated his knowledge and awareness of the non-compete clause by seeking deletion of the provision. Defendant insisted on the inclusion of the non-competition provisions to protect its trade secrets and investment in plaintiff's business. (Defendant's Exhibit AF). On October 29, 1969, the defendant sent plaintiff a revised contract for execution. (Defendant's Exhibit AW).

15. On December 8, 1969, plaintiff and defendant signed a new employment agreement (1969 Agreement) which superseded the 1968 Agreement and which specifically provided:

"The Employee's employment hereunder shall commence on January 1, 1970, and *shall continue until March 31, 1978.* Thereafter, so long as the Employee is capable of performing his duties hereun-

der, this Agreement shall be automatically renewed for successive periods of one year, unless, prior to December 31 in any year after 1976, either party notifies the other of an intention to terminate the Agreement upon the succeeding March 31, in which event the Agreement shall terminate on such date." (Plaintiff's Exhibit 6, ¶ 3). (Emphasis added).

The 1969 Agreement provided that plaintiff would receive a base salary of $25,000 per year plus a share of the profits derived from the Hartford office, together with certain other benefits including a guaranteed payment for the purchase of his business in the event of his death prior to April 1, 1978. (Plaintiff's Exhibit 6, ¶¶ 2, 4, 5 and 14). In response to plaintiff's concerns regarding the 1968 Agreement's non-competition provisions, the 1969 Agreement reduced the effective period of non-competition (a) in regard to the Company's clients from 5 years to 3 years after plaintiff's termination of employment and (b) in regard to services performed by the Company from 5 years to 18 months following the termination of plaintiff's employment. (Plaintiff's Exhibit 6, ¶ 7).

16. On March 31, 1970, Zebedeo expressed his doubts about being able to work in a corporate environment after being a sole proprietor for so many years. (Defendant's Exhibit AX).

17. On August 14, 1970, Zebedeo proposed a termination of the 1969 Agreement as a result of a dispute with defendant regarding the 1969 Agreement's compensation provisions. (Defendant's Exhibit AY).

18. On September 30, 1970, after discussions among plaintiff, his legal counsel, Jerome Gracey ("Gracey") of the firm of Reid & Reige, and defendant, the 1969 Agreement was modified to provide that plaintiff's salary would be increased to $27,500 in 1971 and $30,000 in 1972. (Defendant's Exhibits AY and AH).

19. Plaintiff's performance as manager of the Hartford office was generally satisfactory in 1971 and 1972, during which years the office demonstrated a reasonable level of growth and profitability. (See Defendant's Exhibits GG and FF).

20. In 1972, Martin E. Segal Company modified certain of its accounting practices by substituting a ten percent National Office charge for the former two percent plus actual allocated costs charge. Defendant's separate method of calculating interoffice time charges for client work done by offices other than the billing office was not significantly changed. Defendant maintained a system of interoffice charges whereby any office (including Hartford) would be charged for actuarial work performed on its accounts by any other office (such as the New York and Boston offices). These interoffice charges were a Company-wide practice.

21. Throughout the 1973–78 period, Zebedeo continually questioned and challenged the use of interoffice charges. (See Defendant's Exhibits BE).

22. In 1972, plaintiff raised questions and voiced complaints to senior officers about defendant's accounting system and methods of calculating office and client charges, as he perceived such to affect the calculation of his contractual bonus and incentive pay. (Plaintiff's Exhibit 12).

23. On December 12, 1972, Zebedeo wrote to O'Hara raising questions about expenses and charges. (Plaintiff's Exhibit 12). On December 19, 1972, Gunning responded with a detailed written explanation of how the budget was determined and how charges are made. (Defendant's Exhibit BC).

24. On February 7, 1973, Zebedeo questioned the new National Office charge. (Defendant's Exhibit BD). By written memorandum dated February 12, 1973 and by verbal communication on numerous other occasions, Gunning explained defendant's procedures and methods of accounting to plaintiff. (See Plaintiff's Exhibit 61).

25. Plaintiff had regular input into the preparation of the annual budgets. (See Defendant's Exhibits CC, JJ).

26. Plaintiff received defendant's year-end financial reports and quarterly financial reports in April 1972 and each quarter

thereafter. (Defendant's Exhibits GG, FF, EE, DD, BB, and Plaintiff's Exhibit 8; see also Defendant's Exhibits II, ZZ, AA, LL, AB and Plaintiff's Exhibits 9, 62, 10, 11).

27. In 1973, plaintiff, represented by his attorney, Gracey, again sought to renegotiate the terms of the 1969 Agreement, specifically with respect to the compensation, retirement and non-competition provisions.

28. On April 12, 1973, Zebedeo's counsel complained about the National Office charges and defendant's accounting procedures. (Defendant's Exhibit AI). Thereafter plaintiff and Gracey met with defendant's representatives (O'Hara and Gunning) and negotiated on numerous occasions.

29. On April 25, 1973, Zebedeo told Gracey that he wished to fix a price for defendant to "buy me out so that I can sever my relationship with the Company completely and abide by the non-compete clause." (Defendant's Exhibit AK).

30. During the negotiations, plaintiff stated that he "wanted out" after another 5 years and that he intended to retire or go into some other business. (O'Hara testimony; Gunning testimony). Plaintiff proposed that the Company "buy him out" and sought a special increment for his pension accrual and assurances that his retirement benefits would be vested at the expiration of the Agreement. (Gunning testimony).

31. On June 22, 1973, Gracey submitted a proposal to defendant to resolve plaintiff's concerns. (Defendant's Exhibit AL). On June 25, O'Hara suggested a meeting. (Defendant's Exhibit AM). On July 11, plaintiff and Gracey met with defendant in Boston to discuss the proposal. (See Defendant's Exhibit AM, ¶ 1).

32. The negotiations continued for months with many proposals and counterproposals being exchanged. Defendant agreed to give plaintiff a supplemental one-percent contribution to his pension—not received by any other Company employee—to

facilitate his planned retirement. (See Plaintiff's Exhibit 7 at page 2(c) and Defendant's Exhibit AN). While plaintiff also sought to exclude the non-competition provisions from the Agreement, defendant refused to agree to such a deletion.

33. On November 8, 1972, O'Hara sent Zebedeo a completed agreement for execution (Defendant's Exhibit AO) and a side letter, dated November 5, 1973, detailing certain provisions of the Agreement. (Defendant's Exhibit AR).

34. On January 10, 1974, O'Hara wrote to Zebedeo about his two-month delay in signing the Agreement. (Defendant's Exhibit AP). On January 14, 1974, Gracey proposed a change in the Agreement. (Defendant's Exhibit AQ).

35. On January 25, 1974, Gracey sent the signed Agreement to O'Hara. (Defendant's Exhibit AR). On January 31, 1974, Gracey sent O'Hara the signed side letter.

36. Effective January 1, 1973, the Agreement ("1973 Agreement") increased plaintiff's base pay to $32,500 (Plaintiff's Exhibit 7, ¶ 2(a)(i)), plus $5,000 deferred compensation (*Id.* at ¶ 2(b)), profit sharing from a regional incentive compensation pool (*Id.* at ¶ 2(a)(ii)), a one percent supplementary contribution to the pension plan (*Id.* ¶ 2(c)), and continuation of the guaranteed payments to April 1, 1978. (*Id.* ¶ 2(d)).[2]

37. The 1973 Agreement was made subject to New York law and expressly provided:

> "3. The Employee's employment hereunder shall commence on January 1, 1973, and *shall continue until March 31, 1978.* Thereafter, so long as the Employee is capable of performing his duties hereunder, this Agreement shall be automatically renewed for successive periods of one year, unless, prior to December 31 in any year after 1976, either

---

**2.** Defendant's 1973 pension and profit sharing plans also contained a non-competition provision which provided for forfeiture of benefits for breach of the plan's provisions during the five (5) years following cessation of employment. (Plaintiff's Exhibit 51, ¶ 8.7) Effective

January 1, 1977, the profit sharing and pension plans were amended to conform to ERISA by substituting a provision deferring the payment of benefits until age 65 for the forfeiture provision contained in the 1973 plans. (Defendant's Exhibits CO–6 and CO–11).

party notifies the other of an intention to terminate the Agreement upon the succeeding March 31, in which event the Agreement shall terminate on such date." (Id. ¶ 3) (Emphasis added). Regarding non-competition, the Agreement continued the language from the 1969 Agreement without significant changes.

38. Defendant complied with all provisions of the 1973 Agreement.

39. All of the employment agreements between plaintiff and defendant provided that plaintiff would serve as the Hartford Office Manager and would be responsible for maintaining and improving the financial performance of the office.

40. Plaintiff testified that throughout the period 1974–1977, profitability was of paramount importance to defendant and that it was a topic of frequent communications between him and his superiors. (See Defendant's Exhibit X).

41. Despite defendant's expressed concerns for increased profits, the financial performance of the Hartford Office fell below budgetary projections in the years 1974, 1975 and 1976. (Defendant's Exhibits BB, DD, AT and AV; Plaintiff's Exhibit 8). On April 16, 1974, Zebedeo admitted his "Poor showing (on the bottom line) for . . . 1973") and again criticized the defendant's accounting procedures. (Defendant's Exhibit AZ).

42. Upon receipt of the first-quarter financial report for 1974 (Defendant's Exhibit W), Zebedeo wrote to O'Hara: "I guess you might say that what the report represents to me is complete failure and total devastation . . . . It culminates a series of frustration because the system has the tendency of highlighting failures rather than success. It makes me, for the first time, a party to failure . . . . It is, as complete a devastation as the first atom bomb dropped on Hiroshima." (Defendant's Exhibit X).

43. On numerous occasions during 1974–1976, Gunning, Sass and O'Hara informed the plaintiff of the need for improved financial performance.

44. Throughout the 1974–1976 period, plaintiff received quarterly financial reports and was continually admonished to increase the office's profitability.

45. On April 8, 1974, defendant advised all account executives of the impact of the ERISA legislation on defendant's work. (Defendant's Exhibit CS).

46. Throughout the 1974–1976 period, plaintiff resisted efforts to increase client charges (Defendant's Exhibit LL) and criticized the defendant's financial accounting methods. (Defendant's Exhibits MM, AT and AV).

47. On March 7, 1975, plaintiff received the 1974 year-end financial report. (Defendant's Exhibit BV).

48. Upon learning of the Hartford Office's financial performance for 1974, plaintiff, on March 25, 1975, wrote that he understood that O'Hara wanted "continued growth, better profitability, and acceptance of clients," but proposed a meeting to find "alternatives." (Defendant's Exhibit BA). That day, Gunning wrote to O'Hara about his discussions with Zebedeo concerning the financial performance of the region. (Defendant's Exhibit BW).

49. The budgetary process, cost accounting and the financial accounting methods opposed by plaintiff were applied by defendant uniformly and universally throughout all its nationwide offices.

50. In preparing budgets for the local offices, including Hartford, defendant anticipated interoffice charges when establishing profitability projections. (Gunning testimony). Plaintiff had input into the budgetary process and was consulted to the same extent as other office managers. (See Defendant's Exhibits CC, JJ).

51. The Hartford office consistently exceeded the interoffice charge projections due to its requesting actuarial calculations in excess of what could be charged to clients, which fact contributed to the unfavorable profitability of the Hartford office. (Gunning testimony).

52. There was no evidence that defendant discriminated against the Hartford of-

fice in determining its profitability or performance against budget.

53. The regional profit sharing pool is determined by a formula limited by a threshold level of 15% of gross receipts and based on 15% of the regional net profits in excess of the dollar value of the threshold figure. (Gunning testimony). The regional manager does not share in this pool, which is calculated on the combined performance of the Hartford and Boston offices. The regional manager's profit sharing distribution is separately determined under a different formula. (Gunning testimony). The two figures are then combined solely for accounting purposes.

54. Since for purposes of bonus distributions from the regional pool, the Boston and Hartford offices were merged as a single unit, interoffice charges assessed by Boston against the Hartford office did not affect bonuses distributed to Hartford office employees. (Gunning testimony).

55. Plaintiff continually refused to recognize or accept the bonus pool allocations and complained about what he perceived to be the regional pool's inequities.

56. In 1976, the Hartford office again fell short of budget projections and made no net profit. (Plaintiff's Exhibit 8). Plaintiff expressed strong disagreement with the goals announced by Martin Segal, defendant's founder and chairman of the board, regarding municipal clients. (Zebedeo testimony).

57. Plaintiff was instructed in 1975–76 to increase client fees by 50% to cover the additional work which had been generated by the enactment of ERISA. Plaintiff put those increased fees into effect for only 1.8% of the Hartford office's clients, which was the lowest compliance rate of any of the defendant's offices. (Defendant's Exhibit LL).

58. On November 3, 1976, Zebedeo wrote to O'Hara proposing an addition to the Hartford staff and stating that he had "no reason to expect an increase in light of history." (Defendant's Exhibit AS). Zebedeo also requested that defendant make an exception for him in determining the regional profit pool since he had not received a distribution or a salary increase since 1973. (Defendant's Exhibit AS). Plaintiff did not receive any salary increases from 1973 to 1978.

59. On November 23, 1976, Sass wrote to Zebedeo asking him to recommend a successor as manager of the Hartford office. (Plaintiff's Exhibit 21). Zebedeo recommended Hartford account executive Jack Murphy. (Defendant's Exhibit NN).

60. On December 1, 1976, Sass wrote to O'Hara regarding the problems in the Hartford office stating:

> *"The Problem.* Putting aside personnel problems—and in a small office, problems with one executive and with his case-load can affect profitability—the problem continues to be that *overall* fees are not adequate to support the level of services. [Plaintiff] does not fully appreciate this, even now, because he is able to return to some clients and obtain supplementary fees when time charges outdistance fixed fees and because other clients—not all—are on time charges...." (Defendant's Exhibit CB).

61. On December 1, 1976, Zebedeo wrote to Sass questioning defendant's nine-month financial report and offering his idea on how to show a profit rather than the negative figures generated by defendant's uniform procedures.

62. In December 1976, Zebedeo proposed early negotiations for a new agreement upon expiration of his 1973 Agreement stating:

> "Early as it may seem to you, in reference to my agreement which is going to expire at the end of March in 1978, I would like to start discussions early with the company about a new agreement because the arrangements that I have with the company now are financially not satisfactory. They have not produced the level of compensation and income which I expected when I joined the company close to ten years earlier." (Defendant's Exhibit BQ at p. 10).

Sass transmitted Zebedeo's message to O'Hara. (Defendant's Exhibit BQ at p. 11).

63. In response to the communication from Sass regarding Zebedeo's desire to open negotiations, O'Hara in December 1976 decided not to renew Zebedeo's contract when it expired in March 1978. (O'Hara testimony).

64. O'Hara's decision not to renew Zebedeo's employment agreement was based on (a) the poor financial performance of the Hartford office; (b) Zebedeo's repeated failure to accept the Company's normal practices of accounting and client relationships; and (c) Zebedeo's failure to follow Company instructions regarding fee increases. (O'Hara testimony; see also Defendant's Exhibit BQ at p. 8).

65. On January 11, 1977, Sass, acting on O'Hara's instructions, advised plaintiff that the Company would not renew his employment contract upon its expiration on March 31, 1978. (Defendant's Exhibit BQ at pp. 7 and 9).

66. On January 12, 1977, plaintiff made an initial proposal for a separation agreement which proposed retirement on April 1, 1978 and a two-year or longer consulting agreement plus distribution of his accrued pension and profit sharing accounts. (Defendant's Exhibit I).

67. On January 13, 1977, plaintiff communicated to his attorney his understanding of the defendant's decision not to renew his contract, writing that he had been told that *the job was not being done as the Company had expected.* He also described his proposal of January 12 and his feeling that he must "prepare the way for the establishing of a new consulting firm and challenge head on their non-compete clause." (Defendant's Exhibit H).

68. In a memorandum to defendant's President O'Hara on March 3, 1977, plaintiff wrote: "As you are no doubt aware, discussions between myself and SGA [Sass] have been taking place pursuant to my termination. I have also been requested by SGA to immediately plan on indoctrinating JBM [Murphy] in managerial responsibilities." (Defendant's Exhibit J).

69. On April 5, 1977, Zebedeo wrote to O'Hara concerning a telephone conversation on April 4 wherein he had advised defendant that there was a serious morale problem among his subordinates in the Hartford office. (Defendant's Exhibit OO). In this regard, both Murphy and Pernicka testified that Zebedeo had told them of his termination prior to this time. In his letter to O'Hara, Zebedeo also stated that he wanted to commence negotiations. (Defendant's Exhibit OO).

70. On April 13, 1977, Gunning and Sass met with Zebedeo to begin negotiations on the terms of his departure and a future consulting arrangement. (Plaintiff's Exhibit 48; Defendant's Exhibit BQ at p. 18). Gunning told Zebedeo that he was there on behalf of O'Hara and proposed a consulting agreement to which Zebedeo responded favorably. (Gunning testimony). In response to Zebedeo's report about the problem of staff morale and the staff's uncertainty regarding the Hartford office's future, Gunning agreed with Zebedeo's suggestion that Sass and Gunning should meet with the staff, without Zebedeo, to reassure them and calm their anxieties. (Defendant's Exhibit BQ at p. 20). They also agreed that the staff would be informed, but only in general terms, that amicable discussions were going forward with Zebedeo concerning an arrangement to take effect when he ceased to be manager. (Plaintiff's Exhibit 48).

71. After lunch, Gunning and Sass held a brief meeting with the Hartford account executives. At the beginning of the meeting with staff, only two of the account executives (Pernicka and Millican) were present. Gunning testified that he told them, as he had agreed with Zebedeo, that the management of the Hartford office would change, that a replacement for Zebedeo had not yet been selected, that he and Zebedeo were having amicable discussions regarding the future relations between Zebedeo and the Company and that the continued operation of the Hartford office was assured. (Plaintiff's Exhibit 48). The account executives began asking questions about staff assignments and distribution of client work. Gunning responded that the managerial change would provide them with opportunities to grow and develop.

During this portion of the meeting, the third account executive (Murphy) arrived. While Murphy testified that he recalled references to "younger blood" being made at the April 13, 1977 meeting and tied that statement to a discussion of plaintiff's termination, he could not recall the specific context in which the reference occurred or who made the statement. Murphy admitted that he personally tried to "save" Zebedeo by speaking to people in Boston, telling them, "if the Company proceeded, there would be all sorts of repercussions with the clients." Gunning and Sass both testified that neither of them made any reference to age or "younger blood" during the meeting in discussing the reasons for Zebedeo's termination. Millican did not testify. Pernicka, who was called as a witness for the plaintiff, similarly testified that he had no recollection of any reference to age or "younger blood" in the context of Zebedeo's termination.[3]

72. Joanne Mogensen, a former employee of the Connecticut State Retirement Board, testified that in the Spring of 1977 she had a meeting with Sass and that during their conversation, Sass had told her, as an explanation for the severing of defendant's relationship with Zebedeo, that "Lou was no longer young and they were bringing in younger people with new ideas."

73. Sass recalled his conversations with Mogensen in 1977 in detail (Defendant's Exhibit BQ at pp. 30–36), testifying that the conversations revolved primarily around the preparation of a booklet for the State Retirement Board and other projects the defendant was handling for the Board. He denied making any reference to Zebedeo's age in any of the conversations. (*Id.* at p. 34).

74. Throughout the remainder of 1977, plaintiff's attorneys and defendant ex-

changed proposals and counter proposals for a consulting agreement. (Defendant's Exhibits K, L, M, PP, PR, Q, P, SS; Plaintiff's Exhibit 24). Specifically, on May 9, 1977, Gunning sent a draft proposal to Zebedeo with the covering letter explaining its basic elements. (Defendant's Exhibit K). On May 25, 1977, Gracey replied identifying a problem with the proposed changeover prior to April 1, 1978. (Defendant's Exhibit LO).

75. On May 26, 1977, Zebedeo wrote to Gunning setting forth his thoughts on the negotiations. (Defendant's Exhibit M). On June 15, Gunning and Zebedeo, with his counsel, met to discuss the proposals, which meeting was confirmed in Zebedeo's memorandum of June 20. (Plaintiff's Exhibit 24; see also Defendant's Exhibits P and PP). Zebedeo stated:

"Approximately eight months ago, I was told by our regional manager that my employment contract would not be renewed .... I indicated that such action would have a very disastrous effect on the pursuit of my livelihood in view of the so-called non-compete clause and the Company's intention of forcing my adherence to it ....

"Based on my understanding of the proposal, I feel that we are essentially on the right track. You have emphasized that there is no intention of diminishing or disrupting my present contract. However you do wish to change my work status effective September 1, 1977.... I have concluded upon advice of counsel that such change in status could be worked out, however, all other conditions represented in the contract should stay intact until March 31, 1978 ...." (Plaintiff's Exhibit 24).

---

**3.** In fact, Pernicka, Gunning and Sass all testified that no reason was given for Zebedeo's termination, since Gunning did not want to open the issue and both Pernicka and Murphy knew (from Zebedeo) prior to the meeting of Zebedeo's termination. Neither Gunning nor Sass recalled any references to "junior executives" in connection with their discussions of the opportunities that would be available to Pernicka

and Millican, who were both new employees, and Gunning's contemporaneous memo shows no such reference. (Plaintiff's Exhibit 48). While Sass opined that the word "junior" may have been used, he was certain it would only have been used in the context of describing the status of both Pernicka and Millican. (Defendant's Exhibit BQ at p. 28).

76. On July 11, 1977, Gunning sent Zebedeo a draft agreement. (Defendant's Exhibit PP). The following Tuesday, they discussed the draft, which discussion was confirmed by memorandum dated July 27, 1977. (Defendant's Exhibit RR). On August 8, Zebedeo wrote to O'Hara (Defendant's Exhibit Q) who replied in writing on August 16, after a telephone conversation. On August 24, 1977, O'Hara summarized the whole course of discussion pointing out that:

"During the course of [the 1973] negotiations you made it quite clear that you were interested in extending your working career with the Company for an additional 5 year period through the end of 1977 with a view toward retiring or doing something unrelated on completion of that contract. It was in this context that you negotiated: (1) A contract which, if carried out, would give you sufficient service as an employee of the company to vest in a benefit under our Pension Plan, (2) Supplemental pension benefits which would be payable at the end of the contract, over and above the benefits in our pension plan, (3) A deferred compensation benefit payable in the 5 years subsequent to the completion of your employment. You indicated at that time that the purpose of these provisions was to carry you over to approximately the time at which you would be eligible for Social Security benefits.

"All of this led to a decision by our company to take steps to assure the continuation of service to its Hartford clients once your contract expired according to its terms. The discussions that you have had with Jim Gunning were in keeping with this goal.

"In view of all of this and after rereading your letter of June 20, 1977 I feel that there are no outstanding issues between us which you and Jim could not work out on a mutually satisfactory basis. As background for such a meeting I assure you that it has never been our intention to do anything other than to live up fully to the letter and spirit of our employment contract with you. As you should know well, we do not breach contracts, practice intimidation, or discrimination or attempt to damage anyone's reputation.

"I have asked Earl Palay to work with you and Bob Dellovo to make sure that our company's clients in the Hartford Office suffer no diminution in the quality or quantity of the services they receive during the transition period in the Hartford Office. Your responsibility will be to work closely with Bob and Earl in seeing that our services to our clients are not in any way interrupted.

"I have asked Bob Dellovo to report to the Hartford Office on September 1, 1977 and assume responsibility for the operation of that office. This step is consistent with what was contemplated when you sought and obtained an agreement with us, 5 years ago, which you indicated was the preliminary to your stepping out of our company in 1978. "Your responsibility will be to see that the transfer of your administrative responsibilities to Bob is worked out smoothly under Earl's direction.

"None of the steps which are taken to implement the change in your status at the Hartford Office are to be construed as an indication that we will not live up fully to our employment contract with you. It goes without saying that we expect that you will carry out fully your duties including those which are outlined in this letter." (Defendant's Exhibit P).

77. On August 31, 1977, Zebedeo advised the Hartford staff that Robert Dellovo would be the office manager effective September 1, 1977. (Defendant's Exhibit R). On September 1, 1977, Dellovo in fact became the office manager.

78. On September 19, 1977, plaintiff advised defendant that he had instructed his attorneys "to consider the remedies available to [him] under the age discrimination laws." (Defendant's Exhibit N).

79. On October 4, 1977, O'Hara and Gunning met with Zebedeo and his attorneys to discuss the negotiations. At that meeting, a basic agreement on economic matters was reached with only four or five

outstanding items yet to be resolved. Among the items yet to be resolved was the inclusion of a disincentive clause in the contract whereby Zebedeo would receive compensation, if he helped the Company retain the clients which Zebedeo originally brought with him in the 1968 merger, but lose money if the Company lost any of those clients. (See Plaintiff's Exhibit 28).

80. On October 12, 1977, Zebedeo rejected the entire proposed contract. (Defendant's Exhibit S). On October 26, 1977, O'Hara replied setting forth his understanding of the prior negotiations and enclosing a copy of the agreement for execution. (Plaintiff's Exhibit 28).

81. On November 5, 1977, Zebedeo wrote criticizing the sliding scale concept advanced by O'Hara stating:

"Since I have no idea as to what the various clients of the Hartford office will do in response to your decision, it does not seem reasonable to further bind myself to the Company for what could be little or no economic return by reason of the sliding scale.

"Based on the ultimatum in your letter, I am left with no choice but to pursue whatever legal rights are mine at such time as I had my attorneys deem it appropriate to do so." (Defendant's Exhibit O).

82. On November 18, 1977, Earl Palay wrote to Zebedeo confirming prior discussions regarding the terms of the proposed agreement (Defendant's Exhibit GG) and annexing a draft letter outlining the objectives for the transition period and their respective expectations. (Defendant's Exhibit T).

83. On December 1, 1977, Zebedeo advised Palay that "there is basis for an agreement" but requested further consideration on "several minor points." (Plaintiff's Exhibit 25). On December 14, 1977, Palay replied to Zebedeo agreeing to most of his proposals but setting forth his areas of disagreement. (Plaintiff's Exhibit 26).

84. Later in December 1977, Zebedeo advised Palay that the agreement met with his approval. (Defendant's Exhibit TT).

85. On January 3, 1978, Zebedeo wrote to Palay: "I am happy that we have reached such an agreement" contingent on four economic considerations. He enclosed the signed written agreement effective April 1, 1978 ("Consulting Agreement"). Pursuant to the Consulting Agreement, plaintiff ceased being an employee, but agreed to provide consulting services for an annual consulting fee of $10,000 in 1978 and scheduled amounts approximating $8,000 thereafter. (Plaintiff's Exhibit 23; Defendant's Exhibits U, BG and CH).

86. The Consulting Agreement contains a non-competition clause which is substantially similar to that contained in the 1973 Agreement except that the effective period of non-competition was reduced to 18 months following the termination of the Consulting Agreement. (Plaintiff's Exhibit 23, ¶ 6(iii); see Plaintiff's Exhibit 5, ¶ 12; 6 at ¶ 7; 7 at ¶ 7).

87. Based on Zebedeo's reassurances that he would help maintain the Company's relationship with its Connecticut clients during the Hartford office's period of transition, defendant agreed to drop the disincentive clause from the Agreement. The Agreement contains an incentive clause whereby Zebedeo would receive compensation in addition to his consulting fee for clients retained by the Company. (Plaintiff's Exhibit 23, ¶ 3(b)).

88. Zebedeo did not execute his responsibilities under the Consulting Agreement with the goal of assisting defendant in retaining its clients. Prior to April, 1978, Zebedeo advised the clients that he had been working with that he was being forced out of the business. Certain clients responded with letters to defendant concerning the severing of their relationship with defendant as a result of Zebedeo's departure. On March 9, 1978, Joseph Egan, a client trustee, wrote to defendant stating that "terminating Mr. Lou Zebedeo without just cause or reason is an injustice to Lou .... Therefore, I feel that it is now time for the Iron Worker Funds to start searching for a consulting firm ...." (Defendant's Exhibit CQ). At the same time

Bruce Miller of Insurance Programmers, Inc. wrote a similar letter on behalf of the Plumbers Pension Fund. (See Defendant's Exhibit BK). Zebedeo's communications to clients belie any good faith effort on his part to help defendant retain the clients listed in Appendix A to the Consulting Agreement.

89. Within eighteen months of signing the Consulting Agreement, virtually all of Zebedeo's former clients had severed their relationship with defendant. (Defendant's Exhibit BQ at p. 123).

90. On March 9, 1978, defendant's recently elected President, Earl Palay, informed the Pension Benefit Guaranty Corporation ("PBGC") of Zebedeo's new status with the Company and of his availability to perform consulting services for the PBGC. (Defendant's Exhibits BG and BH).

91. On March 31, 1978, plaintiff completed his term of employment as specified in the 1973 Agreement. (See Defendant's Exhibit R).

92. On April 21, 1978, the Associated General Contractors of Connecticut ("AGC") announced that Zebedeo had been named a vice-president and would begin employment at the AGC on May 1, 1978. (Defendant's Exhibit CI).

93. On May 1, 1978, plaintiff commenced employment with the AGC as previously announced. (See Defendant's Exhibit Y). His initial salary was $26,000. On January 1, 1979, his salary was increased to $27,500. (See Plaintiff's Exhibits 31 and 32).

94. Plaintiff's annual income from the AGC ($26,000) and the Consulting Agreement with the defendant ($10,000) exceeded his annual salary of $32,500 under the 1973 Agreement with defendant. (Plaintiff's Exhibits 31 and 32).

95. On May 3, 1978, the AGC advised defendant that there was no problem with Zebedeo's maintaining the dual relationship of AGC vice-president and consultant for defendant. (Defendant's Exhibit CJ).

96. Plaintiff testified that throughout 1978 and 1979 he did not like his superior at the AGC, Mr. White.

97. Plaintiff voluntarily resigned from his employment with the Associated General Contractors in November, 1979 stating in his resignation letter that his reason for leaving was the AGC's failure to open a Hartford Office, which would be more convenient for plaintiff. (Defendant's Exhibit CK).

98. Defendant did not interfere with plaintiff's employment with the AGC, either before or after he filed his ADEA claim.[4] Nor did defendant preclude plaintiff from accepting any offer of employment. (See Plaintiff's Exhibit 55, p. 2). While plaintiff was aware of the economic consequences of competing with defendant under his agreements, defendant took no action to interfere with plaintiff's earning a livelihood.

99. Defendant's position regarding non-competition has remained the same throughout the entirety of its relationship with plaintiff and was communicated to him prior to his filing a charge with federal and state agencies. (Defendant's Exhibits Z, RR and Q).

100. Defendant has paid all monies owed to plaintiff and has performed all of its contractual obligations pursuant to the 1973 Agreement and the 1978 Consulting Agreement.

101. In 1977 plaintiff's total wages from defendant were $32,650. (Plaintiff's Exhibit 33). In 1978 plaintiff received $39,414 in wages ($12,269 plus $27,145) plus $4,510 in pension money and had an adjusted gross income of $43,410. (Plaintiff's Exhibit 32). In 1979 plaintiff received wages of $25,311 from the AGC during the first 10 months plus $13,000 from defendant plus $7,831 from defendant's pension and profit sharing plans and had an adjusted gross income of $46,716. (Plaintiff's Exhibit 31).

---

**4.** While plaintiff's counsel asserted that defendant had interfered with plaintiff's employment at the AGC, plaintiff chose not to call Mr. White as a witness and offered no evidence to support counsel's representation.

102. If plaintiff had not voluntarily resigned his AGC employment in November 1979, his 1979 earnings would have been $42,894 ($38,311 plus ⅙ of $27,500) plus $7,831 pension for a total of $50,725, and his total 1980 income would have been even greater, as would his 1981 and 1982 earnings.

103. On September 15, 1978, plaintiff for the first time filed a charge of discrimination with the United States Department of Labor and the Connecticut Commission on Human Rights and Opportunities. (Defendant's Exhibits A and B).

104. Plaintiff and defendant from the inception of their relationship agreed upon an employment term of ten years which term expired on March 31, 1978. Defendant was under no legal obligation to extend the term of plaintiff's employment.

105. Plaintiff offered no credible, relevant evidence of any other employee in the protected age category being involuntarily terminated by defendant. (See Plaintiff's Exhibit 20 and Schaie testimony). While the plaintiff presented several examples of employees in the protected age category leaving the employ of the defendant, the plaintiff failed to take into account the personal reasons and motivations which led to their separation from employment.

106. Plaintiff did not establish a pattern or practice of replacement of older employees with younger employees but instead relied on a purported study conducted by Dr. K. Warner Schaie.

107. In this area, the plaintiff relied on the testimony of Dr. Schaie, whose testimony was not based on any statistical analysis of a defined population of employees. (Plaintiff's Exhibit 67 at pp. 24, 33, 45 and 51). It was merely based on personal conjecture derived from a brief reading of data selected by plaintiff's counsel. (Defendant's Exhibit BJ).

108. Dr. Schaie had no knowledge of any other terminations among defendant's managers. (Plaintiff's Exhibit 67 at pp. 97 and 108). In his opinion, persons promoted to senior management, those resigning for purely personal reasons and those transferred to another of defendant's offices are to be considered "terminated" for purposes of his analysis. (Schaie testimony).

109. Dr. Schaie admitted that he did not do a scientific study and that there was a high probability of error in his conclusion. (Plaintiff's Exhibit 67 at pp. 23, 40 and 76). Contrary to Dr. Schaie's assumptions, Cahn resigned to practice law and Hack elected voluntary retirement. Plaintiff's witness, Donald Walters, defendant's former Regional Manager in Atlanta, testified that he voluntarily resigned from defendant's employ in 1978 due to the constant "profit" pressures.

110. Defendant has promulgated and maintained a policy of providing equal employment opportunities to all without regard to age. (Defendant's Exhibit V).

111. Defendant has uniformly sought to enforce its noncompetition clause without regard to age or the filing of any type of discrimination complaint. For example, when Walters went into a competing business within the meaning of the profit sharing plan, his distribution was deferred pursuant to the plan. (Walters testimony). Similarly, Matthew Ryan was under age 40 at the time he left defendant's employ. When defendant learned he was competing in violation of the non-competition provisions, his benefits were forfeited under the then existing plan. (Gunning testimony).

112. Defendant's claim regarding the right to enforce the contractual non-compete clause predates the filing of any charge of age discrimination by Zebedeo. (See Plaintiff's Affidavit dated September 15, 1978 annexed to his charges; Defendant's Exhibits A and P, ¶ 8; D; H).

113. Prior to signing the Consulting Agreement with Segal on January 4, 1978, plaintiff had full knowledge of his ADEA claim against defendant arising out of the non-renewal of his employment agreement; that knowledge notwithstanding, the plaintiff executed said Consulting Agreement. He thereby extended his employment on a part-time basis collecting $10,000 for the first year of the 5-year term and $8,000 a year thereafter.

114. Plaintiff had competent legal counsel, who actively represented him from at least 1973 and, in regard to his claim of age discrimination, since January 13, 1977.

115. Defendant did not discriminate against plaintiff because of his age.

116. The defendant suspended and deferred the plaintiff's profit-sharing distribution on May 5, 1980, and thereafter, because the plaintiff violated the non-competition clause of said profit-sharing plan. (Plaintiff's Exhibits 13, §§ 7.7, 7.11). During this time, the plaintiff sought out an affiliation with Insurance Programmers, Inc., under the name, Louis J. Zebedeo Associates, Inc., to do administrative work substantially similar to and in competition with the defendant (Plaintiff's Exhibit 39), in violation of the above-cited sections of the profit-sharing plan.

117. Defendant did not retaliate against plaintiff because he filed a claim under the ADEA.

### Conclusions of Law

### Introduction

The plaintiff Zebedeo presented two claims, one under each of the following provisions of the ADEA.

"(a) It shall be unlawful for an employer —(1) to fail or refuse to hire or to discharge an individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

"(d) It shall be unlawful for an employer to discriminate against any of his employees ... because such individual ... has opposed any practice made unlawful by this section, or because such individual ... has made a charge ... under this chapter." 29 U.S.C. § 623(d).

■ The plaintiff's first claim is that the defendant Company's failure to renew his contract after March 31, 1978 constituted an illegal discharge in violation of § 623(a)(1). It is important to note that while § 623(a)(1) prohibits illegal discrimi-

nation because of age, the ADEA allows an employer to "base its decision on 'reasonable factors other than age,'" or to "discharge an individual 'for good cause.'" *Pena v. Brattleboro Retreat*, 702 F.2d 322, 323 (2d Cir.1983), *citing* 29 U.S.C. § 623(f)(1), (3).

The plaintiff's second claim is that the defendant Company retaliated against the plaintiff after he had filed charges of age discrimination. Included among the purported retaliatory acts was an allegation that the defendant engaged in the retaliatory enforcement of the non-competition clause of several benefit plans and of the written Consulting Agreement negotiated between the plaintiff, Zebedeo and the defendant Company. The plaintiff contends that this alleged retaliation contravenes § 623(d), *supra*, of the ADEA.

The plaintiff was born on August 10, 1921 (See Findings of Fact No. 3), and was therefore a member of the protected class under the ADEA. 29 U.S.C. § 631. The Court has jurisdiction under 29 U.S.C. § 626(c).

At the close of the trial, the defendant-employer renewed its motion to dismiss, pursuant to Rule 41(b), Fed.R.Civ.P., on three grounds. Defendant claims (1) that the plaintiff failed to satisfy a condition precedent to the bringing of this action, to wit, the filing of a timely complaint with the appropriate administrative agency; (2) that the plaintiff failed to prove a prima facie case of age discrimination; and (3) that plaintiff failed to present any evidence of a causal connection between the alleged retaliatory behavior and plaintiff's filing of a discrimination charge. Viewing the administrative filing claim as a crucial preliminary matter, the Court shall deal with that issue first. The Court will then address the discrimination and retaliation questions within its discussion of those claims in general.

### A. The Timeliness of Plaintiff's Administrative Complaint

■ As a condition precedent to bringing suit in federal court, § 626(d) of the ADEA

requires a grievant in a deferral state [5] like Connecticut, to file an administrative charge of unlawful discrimination" within 300 days after the alleged unlawful practice occurred." 29 U.S.C. § 626(d)(2). *Mohasco Corp. v. Silver*, 447 U.S. 807, 823–24, n. 42, 100 S.Ct. 2486, 2495–96, n. 42, 65 L.Ed.2d 532 (1980), *Postemski v. Pratt & Whitney Aircraft*, 443 F.Supp. 101, 102–03 (D.Conn.1977). This time period begins to run at the time the decision to terminate is "made and communicated to" the grievant. *Delaware State College v. Ricks*, 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980).

In this case, the defendant advised the plaintiff of its intent to terminate him on January 11, 1977, as Vice-President and Manager of the Hartford District Office. (Defendant's Exhibit BQ, pp. 7, 9). However, the clarity of this decision was clouded thereafter by the ambiguous verbal intimations of the defendant's Vice-President and Regional Manager, Sherman Sass to the plaintiff, that he might be transferred if other mutually satisfactory employment could be found in the Atlanta field office, rather than be terminated. Under similar equivocal circumstances, courts have required an explicit letter of termination as the triggering agent for the commencement of the period of limitations. *Id.* at 262, 101 S.Ct. at 506, *Downie v. Electric Boat Division*, 504 F.Supp. 1082, 1085 (D.Conn.1980). Under these facts, the Court finds that the defendant's letter of termination, mailed to the plaintiff on December 30, 1977, actually commenced the time period for filing. As such, the plaintiff's administrative complaint, filed on September 15, 1978 with the Department of Labor, fell within the 300-day period, and was therefore timely.

B. *Age Discrimination Claim*

The plaintiff alleges, in essence, that the defendant discharged him because of his age, (56 years) in violation of 29 U.S.C. § 623(a)(1), *supra.* The plaintiff brings his case as one arising under a

discriminatory or disparate treatment theory. "Discriminatory or disparate *treatment* in violation of the ADEA occurs when an employer treats [a person] less favorably than others because of age." *Air Line Pilots Association, International v. Trans World Airlines, Inc.*, 713 F.2d 940, 951 (2d Cir.1983) (italics in original). Disparate treatment cases normally require the plaintiff to prove a discriminatory motive, but such a motive "can in some situations be inferred from the mere fact of differences in treatment." *Geller v. Markham*, 635 F.2d 1027, 1031 (2d Cir.1980), *cert. denied*, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). As in racial discrimination cases arising under Title VII, courts have allocated the burdens and order of going forward with evidence among the parties in ADEA cases.

Under this now-familiar allocation of these burdens, the

"plaintiff has the initial burden of offering adequate evidence to raise an inference that an employment decision was based on discriminatory criteria illegal under the Act. Once this burden is discharged, the plaintiff has made out a prima facie case. Then the defendant must come forward and articulate some legitimate, non-discriminatory reason for the employer's actions. The plaintiff thereafter must, in order to prevail, prove that the defendant's proffered reason is merely a pretext for discrimination." *Air Line Pilots, supra*, at 951–52.

This shifting of the production burdens notwithstanding, the ultimate burden of persuasion remains with the plaintiff to prove, by a preponderance of the evidence, that "age was a determinative factor in the employer's decision." *Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 81 (2d Cir.1983), *citing U.S. Postal Service v. Aikens*, —— U.S. ——, ——, 103 S.Ct. 1478, 1480, 75 L.Ed.2d 403 (1983). *In accord* are *Parcinski v. The Outlet Co.*, 673 F.2d 34, 36 (2d Cir.1982), *cert. denied*, 459 U.S. 1103, 103

---

**5.** Deferral states are states which have enacted their own age discrimination laws. *Downie v.* *Electric Boat Division*, 504 F.Supp. 1082, 1084 (D.Conn.1980).

S.Ct. 725, 74 L.Ed.2d 950, *Geller, supra,* at 1032, *Goodman v. Heublein,* 645 F.2d 127, 130, (2d Cir.1981), *rehearing denied,* (1981) *Loeb v. Textron,* 600 F.2d 1003, 1015 (1st Cir.1979), *Stanojev v. Ebasco Services, Inc.,* 643 F.2d 914, 921 (2d Cir.1981).[6]

In this case, the Court finds that the plaintiff has successfully presented a prima facie case of age discrimination, but has not satisfied his ultimate burden of persuasion. The plaintiff has failed to prove, by a preponderance of the evidence, that imper-

missible age considerations comprised a determinative factor in his discharge.

## 1. *Prima Facie Case*

■ Although the four-pronged *McDonnell Douglas* test[7] supplies the appropriate prima facie elements for most discrimination situations, the courts have been particularly sensitive to avoid elevating this test to the level of an inflexible pre-requisite. Considering the vast spectrum of facts and circumstances operating in discrimination

6. The plaintiff offered circumstantial and statistical evidence of age discrimination by the defendant at trial. The Court discounts much of this evidence (the "Bernstein" press release, the failure of Zebedeo to find EEOC notices at the defendant's place of business and the other circumstantial evidence) as insubstantial, and the rest of this evidence (Dr. Schaie's testimony and report) as proceeding from fundamentally incorrect assumptions (See Findings of Fact Nos. 108–109) and therefore inherently unreliable. (Cf. Dr. Schaie's report with Defendant's Exhibit BR). The Court thus declines to find any of this evidence either persuasive or worthy of consideration in the plaintiff's attempts to prove his prima facie case.

7. The plaintiff's reliance upon *Lee v. Russell County Board of Education,* 684 F.2d 769 (11th Cir.1982) and ultimately upon *Mount Healthy School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) for the proposition that the burden of persuasion shifts to the defendant when the plaintiff presents direct, credible evidence of discriminatory intent is misplaced. First of all, the United States Supreme Court has twice underscored the fact that, in discrimination cases, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207; *in accord Aikens, supra,* 103 S.Ct. at 1482. Furthermore, the direct evidence referred to in *Lee* is not direct evidence, which merely gives rise to an inference supporting a prima facie discrimination case. Rather, it is "direct testimony that the defendants acted with a discriminatory motivation," evidence whereby a "significant unconstitutional motive is ultimately proved." *Id.,* at 774. In other words, it is direct evidence which is so powerful, that it leapfrogs all three components of the *McDonnell Douglas* test; direct evidence that satisfies the plaintiff's ultimate burden of persuasion and proves that a significant unconstitutional discriminatory consideration caused the discharge. The direct evidence in this case, as

we shall see *infra,* is of a weaker variety. Like that referred to in *Stanojev, Hagelthorn,* and *Air Line Pilots, infra,* the direct evidence in this case is only strong enough to allow for a prima facie inference to be drawn, and is not powerful enough to sustain the plaintiff's ultimate burden of persuasion. Finally, the trust that plaintiff reposes in the "circumstantial-direct evidence" dichotomy is betrayed by the very language of *Lee* itself. The plaintiff maintains that the usefulness of *McDonnell Douglas* and its progeny, including the placing of the burden of persuasion on plaintiff lies solely in cases where circumstantial evidence alone is adduced. Where direct evidence is presented, continues the plaintiff, there is no reason to be bound by the order and burden of proof of the "circumstantial evidence" cases. Although *Lee* does point out that *McDonnell Douglas* and its progeny are most helpful in focusing the inquiry where circumstantial evidence is relied upon, its holding that the burden of persuasion shifts to the defendant refers to cases in which whether by "circumstantial *or* direct evidence," a "significant unconstitutional motive is ultimately proved." *Lee, supra,* at 774 (emphasis added). Thus, the only dichotomy which might conceivably allow for burden-shifting is not the "circumstantial-direct evidence" dichotomy, but rather the "proven-yet to be proven" dichotomy. In other words, *Lee*-type burden shifting could serve a useful purpose only in situations in which the plaintiff has already proven a discrimination case, and then only to give the defendant another "bite at the apple" of rebuttal.

In sum, to the extent that the plaintiff's novel theory shifts the burden of persuasion to defendant while the trier of fact is attempting to arrive at the ultimate conclusion in a discrimination case, it has been rejected out of hand by both *Burdine* and *Aikens.* To the extent that this theory assumes a factual situation in which direct evidence proves, by a preponderance, that an unconstitutional motive comprised a significant, determinative factor in an employment decision, it is not relevant to the facts as adduced in this case.

cases, the courts have been loathe to fashion the *McDonnell Douglas* test into a "Procrustean bed within which all disparate treatment cases must be forced to lie." *Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1556 (11th Cir.1983). *See also, McDonnell Douglas v. Green,* 411 U.S. 792, 802, n. 13, 93 S.Ct. 1817, 1824, n. 13, 36 L.Ed.2d 668, *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), *Hagelthorn, supra,* at 81. To that end, the courts have recognized other means by which a plaintiff can adduce the evidence necessary to support a prima facie case of discrimination, to wit, evidence that raises "an inference that an employment decision was based on discriminatory criteria illegal under the Act." *Air Line Pilots, supra,* at 951. Direct proof is one such means.

■ Three recent Second Circuit ADEA decisions have identified such evidence as a means of proving a prima facie case. These are *Stanojev, supra,* at 921, *Hagelthorn, supra,* at 81, and *Air Lines Pilots, supra,* at 952. Of these three, *Stanojev* explained most clearly what kind of direct evidence would suffice. "Direct proof" that the "employer had told the employee that he was being fired because of his age," or that the defendant's officers had indicated "a preference for younger employees," coupled with a discharge of an employee in the protected age group would compel the prima facie inference. *Stanojev, supra.*

Such evidence exists in this case. John Murphy, an account executive of defendant's Hartford office, testified both at trial and in his deposition, that James Gunning, an officer of defendant, told him that the plaintiff was being terminated to make room for "younger blood." (Findings of Fact No. 71). Joanne Mogensen, an employee of a client of the defendant, testified that Sherman Sass, another officer of the defendant, commented that the plaintiff was being discharged because he was no longer young, and because the local office needed a younger person with new ideas and a fresh outlook. (Findings of Fact No. 72). Robert L. Pernicka, a local staff member of defendant, wrote a letter which stat-

ed that both Gunning and Sass told several staff members, Pernicka included, that the "company was in the process of replacing senior members with younger members of the company." (Plaintiff's Exhibit 4). While the defendant raised several substantial challenges to the credibility of the testimony of Murphy, Mogensen and to the letter of Pernicka (including allegations of bias, misplacing of crucial, contemporaneous notes, and the failure of specific memory), the Court finds that this evidence, taken in conjunction with plaintiff's discharge, satisfies the minimal requirements of an ADEA prima facie case.

2. *The Defendant's Rebuttal*

■ "Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason' for the employee's termination." *Hagelthorn, supra,* at 81, *quoting Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The defendant is neither "required to prove that there was a justifiable cause" for the plaintiff's discharge, *Stanojev, supra,* at 921, nor to convince the trier of fact that the defendant's business judgment is sound. *Loeb, supra,* at 1012, n. 6. Moreover, "the defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine, supra,* 450 U.S. at 254, 101 S.Ct. at 1094. Rather, the defendant must reasonably articulate, in the form of admissible evidence, legitimate reasons for its decision that "meet the prima facie case," and "'rebut' or 'dispel' the inference of discrimination that arises" therefrom. *Loeb, supra,* at 1011–12, n. 5, *citing International Brotherhood of Teamsters v. U.S.,* 431 U.S. 324, 360, n. 46, 97 S.Ct. 1843, 1867, n. 46, 52 L.Ed.2d 396. Such reasons will be sufficient to rebut the prima facie case if they raise a "genuine issue of fact as to whether [the defendant] discriminated against the plaintiff," if they are "legally sufficient to justify a judgment for the defendant," and if they "frame the factual issue with such clarity so that the plaintiff will have a full and fair opportuni-

ty to demonstrate pretext" in the next step of production of evidence. *Burdine, supra,* 450 U.S. at 255–56, 101 S.Ct. at 1094–95. As such, neither a "passing reference" by a single witness to an employment deficiency of the plaintiff nor "vague, general averments of good faith" would suffice. *Loeb, supra.* Further, the defendant's rebuttal must be directed to the plaintiff's individual case; the employment success of other members of the protected class in the defendant's establishment will not excuse discrimination against the individual plaintiff. *Air Line Pilots, supra,* at 953.

Guided by this collective wisdom and weighing the credible evidence adduced in this case, the Court finds that the defendant has successfully rebutted the plaintiff's case of age discrimination. The Court finds the following legitimate reasons for the plaintiff's discharge.

The testimony of the plaintiff and of the defendant's officers, O'Hara and Gunning, pointed out that, for at least three consecutive years, 1974, 1975 and 1976, the plaintiff failed to perform his job to the reasonable satisfaction of his employer. (See Findings of Fact Nos. 41–42). On numerous occasions during this period, O'Hara and Sass informed the plaintiff of the need for improved financial productivity and performance. (See Findings of Fact No. 43). The plaintiff himself, upon reviewing the first-quarter financial report for 1974, realized that the financial picture of the Hartford office was one of "complete failure and total devastation ..., as complete a devastation as the first atom bomb dropped on Hiroshima," (See Findings of Fact No. 42), but he persistently and stubbornly refused to implement nationally-mandated and otherwise universally-applied company policy to remedy the situation. (See Findings of Fact Nos. 46, 49, 51). Additionally, the plaintiff constantly criticized these company policies, disagreed with goals announced by Martin Segal himself, the defendant's founder and chairman of the board, and otherwise expressed no desire to attempt to improve the bleak situation.

(See Findings of Fact Nos. 21–24, 41, 55, 61).

▮▮▮ The Court finds that this evidence comprises proof of one "of the two most common legitimate reasons [articulated by employers in discrimination cases]: lack of qualifications." *Air Line Pilots,* supra, at 952. Qualification for a job, or lack thereof, is not a static thing. As the Seventh Circuit has pointed out, "qualification obviously depends on the nature of [the employer's] business at any given time;" and further, "to ignore the shifting nature of qualification from time to time would make the qualification requirement meaningless." *Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1219 (7th Cir.1980), *cert. denied* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383. The qualification of an individual employee for an individual position must be viewed against the backdrop of his or her employer's needs at the time of the alleged discriminatory treatment. It appears uncontroverted that the plaintiff was a satisfactory employee during the first few years of his association with the defendant. However, it appears equally uncontroverted that, for the three-year period just prior to his discharge, plaintiff failed to achieve his employer's most important goal for the Hartford office at that time: increasing its profitability. Moreover, his stubborn refusal to follow company policy illustrated an unwillingness to even attempt to achieve his employer's goal. By adducing this evidence, the defendant has successfully rebutted the plaintiff's prima facie case of age discrimination. (See Findings of Fact No. 64).

3. *Demonstrating Pretext: The Plaintiff's Ultimate Burden of Persuasion*

▮▮▮ At this point in the inquiry, the burden shifts back to the plaintiff to " 'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.[8] ' " *Hagelthorn, supra,* at 81–82, *quoting Bur-*

---

**8.** *See McDonnell Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

*dine, supra,* 450 U.S. at 253, 101 S.Ct. at 1093. To prove pretext means to demonstrate, by a preponderance of the evidence, that "the legitimate reasons offered by the defendant were not its true reasons." *Id., quoting Burdine, supra.* In so doing, the plaintiff is "not required to show that the reasons offered were false, but that they were not [the defendant's] only reasons and that age made a difference." *Id., citing Golomb v. Prudential,* 688 F.2d 547, 551 (7th Cir.1982) and *Parcinski, supra,* at 36. The kind of difference that the plaintiff must prove age made has been variously described by the Second Circuit. It has been held that impermissible age considerations do not have to have been, the "sole factor," but must have been, more likely than not, a "causative" or "determinative" factor, *Geller, supra,* at 1035, *Hagelthorn, supra,* at 82, a "factor that made a difference" in the discharge decision, *Bentley v. Stromberg-Carlson,* 638 F.2d 9, 11 (2d Cir. 1981), *Parcinski, supra,* at 36, "in the sense that 'but for' his employer's motive to discriminate against [the plaintiff] because of age, he would not have been discharged." *Geller, supra, citing Laugesen v. Anaconda Co.,* 510 F.2d 307, 317 (6th Cir.1975). In essence, the plaintiff's burdens to prove pretext and causation by a preponderance of the evidence now merge "with the ultimate burden of persuading the court that [he] had been the victim of intentional discrimination." *Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095.

Assessing the evidence within this framework, the Court concludes that the plaintiff has failed to sustain his ultimate burden of persuasion in this case. While the plaintiff has presented some evidence of mixed motivation in the testimony of Murphy, Mogensen and in Pernicka's letter, the plaintiff has not shown that it is more likely than not that age was a causative factor, that "but for" the employer's motivation to discriminate against him due to his age, he would not have been terminated.

The evidence adduced at trial shows that the defendant had a legitimate, non-discriminatory business reason for its decision to replace the plaintiff as manager of its Hartford office. (See Conclusions of Law,

§ B. 2., *supra* ). In view of this fact, and in view of the extensive documentation and testimony introduced to illustrate the defendant's predominant concern with profitability, the plaintiff has failed to prove either: (1) that the defendant's articulated reasons were a pretext, or (2) that age was a causative factor in the defendant's decision to terminate the plaintiff.

## C. *Retaliation Claim*

The plaintiff maintains that the defendant retaliated against him after the plaintiff filed his age discrimination charges. The allegations of the retaliation claims revolve around the non-competition clauses of the Consulting Agreement which the plaintiff executed on January 3, 1978 (See Findings of Fact No. 85) and of the pension and profit-sharing plans. As the plaintiff himself testified, the defendant has paid him all pension benefits due and owing. Thus, the only non-competition clauses properly before the Court are those found in the Consulting Agreement and in the profit-sharing plan. These state, in pertinent part:

### Consulting Agreement

6(iii)

"As a result of the position which he occupies and the confidence placed in him by the Company, the Consultant has been entrusted with significant responsibilities.... The parties recognize that if the Consultant were to engage in any direct competition with the Company while engaged by the Company or during the period immediately after termination of his engagement, the Company and its continuing operations would be unfairly damaged. Accordingly, during the term of his engagement and for 18 months after termination of his engagement, the Consultant shall not perform any services of any kind generally rendered within six months prior to the termination of his engagement by the Company or a related company or within a 25 mile radius of the corporate limits of any city in which the Company or a related company maintained an office for the transaction of any such businesses. The foregoing shall not prohibit the Consultant after

termination of his employment from accepting employment by an insurance company." (Plaintiff's Exhibit 23).

*Profit-Sharing Plan of 1977*

§ 7.7

"If a distribution is made by the payment of annual installments, and if the provisions of Section 7.11 become applicable within 5 years after the date of the Participant's termination and before his Normal Retirement Date, then (a) if the Participant had at least 10 Years of Service, further distribution shall be deferred until after the Valuation Date coincident with or next following the earlier of his Normal Retirement Date or the date of his death."

§ 7.11

"This subsection shall apply to any Participant who, during the course of his employment or for a period of 5 years from the date of his employment with a Participating Company, except on behalf of a Participating Company or any corporation engaged in substantially the same business as any of the Participating Companies 50% or more of whose voting stock is owned, directly or indirectly, by a Participating Company or its parent company, any of such corporations being sometimes hereinafter referred to as a Related Company: ... directly or indirectly, under any circumstances whatso-

ever, except on behalf of a Participating Company or a Related Company, seeks an affiliation with, or becomes interested as, an individual, partner, stockholder, director, officer, principal agent, employee, or in any relation or capacity whatsoever, in or to, any person, association, firm, or corporation who or which shall ... engage in any work or services of the type rendered by a Participating Company within the 5-year period ending on the date of termination of his employment, in connection with profit-sharing, pension, welfare, or similar funds, audits of insurance companies, fraternal benefit societies, or similar companies or societies in, or within a 25-mile radius of, any city of the United States in which a Participating Company or a Related Company, within such 5-year period, maintained an office for the transaction of any such business." (Plaintiff's Exhibit 13).

▮ The plaintiff alleges (1) that the defendant induced the plaintiff to agree to the Consulting Agreement under duress, (2) that the defendant enforced the non-competition clause of the Consulting Agreement in a discriminatory fashion, and (3) that the defendant retaliated against the plaintiff by deferring his profit-sharing distributions under the guise of enforcing the non-competition clause of the profit-sharing plan.[9] These acts, according to the plain-

---

**9.** There remains some question as to what issues are before the Court concerning the non-competition clause. The plaintiff's rather incohesive Second Claim attempts to shoehorn into this ADEA retaliatory claim two essentially state claims, namely the "duress" claim and a claim that the non-competition clauses are "illegal in and of themselves." As the plaintiff has failed to invoke the Court's diversity jurisdiction and although the plaintiff has failed to invite the Court to exercise its pendent jurisdiction, the Court's decision to hear these claims would be an exercise of its pendent jurisdiction. While the Court finds that deciding the duress issue is a necessary precondition to its consideration of the retaliation issue, (retaliation under the ADEA having been clearly placed before the Court by the pleadings), the Court shall consider the duress issue. The Court, however, reaches a different result concerning the inherent validity of the non-competition clauses. The vague and incomplete reference to the clauses being "illegal in and of themselves," combined with the fact that no material evidence (comments of

counsel, of course, notwithstanding) was offered regarding this allegation argue persuasively for the conclusion that the Court should not consider the validity of the non-competition clause under the pleadings as they now stand. The actions of plaintiff's counsel in seeking to amend his complaint at the eleventh hour further reinforce this conclusion.

Apparently unconvinced that the issue of the validity of the non-competition clauses was properly before the Court, the plaintiff moved, on September 23, 1983, the penultimate day on which testimony was heard in this case, to amend his complaint "to conform to the proof presented." The amendment, sought, pursuant to Rule 15(b), Fed.R.Civ.P., to add, *inter alia*, an allegation that the non-competition clauses were, on their faces, violative of the public policy of both New York and Connecticut. At that point, the Court reserved decision. At this point, the Court denies this motion to amend for several reasons. (1) No material evidence was introduced on this issue during the case to

tiff, constitute retaliation actionable under 29 U.S.C. § 623(d). *Supra*, at p. ——.

### 1. *The Duress Claim*

The plaintiff claims that the defendant induced the plaintiff to agree to the Consulting Agreement, and *a fortiori*, to its non-competition clause, under duress. Nothing could be further from the truth.

■■■■ The Connecticut courts have held that "it is undoubtedly true that a contract obtained by duress is unenforceable." *Brotherhood of Teamsters v. Purity Food Co.*, 17 Conn.Supp. 12, 13 (1950). This result obtains because, for a contract to be valid, it "must be the result of the free assent of the parties making it." *McCarthy v. Taniska*, 84 Conn. 377, 381, 80 A. 84 (1911). Hence, if one party's wrongful conduct strips the other party of his or her free will for the purposes of obtaining a contract, and succeeds in so doing, such a contract is *void ab initio*. *Id.*, citing *Galusha v. Sherman*, 105 Wis. 263, 277, 81 N.W. 495, 47 L.R.A. 417. The wrongful conduct at issue could take virtually any form, but must induce a fearful state of mind in the other party, which makes it "impossible for him to exercise his own free will." *Id.* Moreover, where one party insists upon a contractual provision, which it honestly believes itself entitled to, unless such belief is patently unreasonable, the conduct cannot be wrongful, and thus, cannot constitute duress. *Weiner v. Minor*, 124 Conn. 92, 95, 197 A. 691 (1938). The facts of this case illustrate nothing resembling duress.

■ On January 12, 1977, the day after the plaintiff first learned of the defendant's intent to terminate him, the plaintiff made an initial proposal for a satisfactory separation agreement and consulting agreement. (See Findings of Fact No. 66). For the remainder of 1977, the plaintiff and the defendant exchanged proposals and counter-proposals for a consulting agreement. (See Findings of Fact Nos. 66–68, 70, 74–76, 79–85). Ample evidence exists therein of the ongoing give-and-take that epitomizes good faith negotiating between parties of equal bargaining power. On January 3, 1978, the plaintiff signed the Consulting Agreement, and returned it to the defendant. Throughout this year of negotiation, the plaintiff was represented by Attorney Jerome Gracey of the firm of Reid and Reige of Hartford, Connecticut. The Court takes judicial notice of the fact that Reid and Reige specializes in and enjoys a professional reputation of having a great deal of expertise in the area of employment negotiations, trusts, pension benefits, profit-sharing plans, and taxes. Nothing in the process of negotiation, which extended over many months, indicates that the defendant inculcated any fear, via threats, intimidation, or otherwise, sufficient to deprive the plaintiff of his free will. The evidence of ongoing, active negotiation illustrates just the opposite.

Likewise, nothing in the substantive terms of the Agreement displays duress. The plaintiff received a healthy sum ($10,-000 in 1978 and approximately $8,000 a year for the next four years) for consult-

---

which the complaint should have been conformed; hence, the case was not, as a whole, tried on this issue. (2) The defendant neither expressly nor impliedly consented to such an amendment; in fact, it opposed the amendment stringently. (3) The late introduction of this new cause of action would unfairly prejudice the defendant, as no discovery was undertaken on this issue. 3 J. Moore, *Federal Practice,* ¶ 15.13[2], pp. 15–178—179. (4) The amended complaint, if allowed, would interject a state count, requiring interpretation of important and complicated state public policy, best decided by a state court, into an otherwise essentially federal action. Under these circumstances, "as a matter of comity and to promote justice between the parties by procuring for them a surer-

footed reading of applicable law," the Court declines to exercise its pendent jurisdiction over the validity claim. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). As the duress claim has been sufficiently placed before the Court by the Second Claim of the plaintiff's Second Amended Complaint (see this note, *supra* ), the Court denies the plaintiff's September 23, 1983 motion to amend his complaint. The Court today rules only upon the duress and the retaliation issues. The Court expresses no opinion as to the underlying merits of the claim that the non-competition clauses discussed herein are, on their faces, violative of the public policy of either New York or Connecticut. This question is best left to the more experienced state courts involved.

ing. (See Findings of Fact No. 85), while remaining free to seek any other employment save that covered in the non-competition clause. This provision served the plaintiff quite well financially. The plaintiff's annual salary as a Vice-President at Associated General Contractors of Connecticut ("AGC"), his first job after his termination from the defendant, $26,000 in 1978, coupled with his consulting fee from the defendant, $10,000, exceeded his annual salary of $32,500 for the last year of his employment with the defendant. Moreover, the non-competition clause was substantially similar to, with the exception of enjoying a briefer duration than, those contained in each of the plaintiff's previous employment contracts with the defendant. The non-competition clause of the Consulting Agreement was particularly similar to that of the 1973 Agreement. (Plaintiff's Exhibit 23, ¶ 6 (III); see also Plaintiff's Exhibit 5, ¶ 12, Plaintiff's Exhibit 6, ¶ 7, Plaintiff's Exhibit 7, ¶ 7). Such striking similarity and consistency does not allow the Court to infer that the defendant had recently deprived, by means of duress, the plaintiff of his ability to exercise his free will. Finally, the agreement, in its completed form, included an incentive clause, whereby the plaintiff received extra compensation for clients retained by the defendant (favored by the plaintiff in negotiation), rather than a disincentive clause, whereby the plaintiff would have had sums subtracted from his consulting fee for former clients of the plaintiff lost by the defendant after the plaintiff's termination (favored by the defendant in negotiation). (See Findings of Fact No. 87). The inclusion of the incentive clause rather than the disincentive clause illustrates the bargaining power of the plaintiff in negotiations. Moreover, the inclusion of the incentive clause does not reflect the workings of a mind devoid of free will. In sum, there is nothing in this case which indicates that duress was involved in the negotiation of the Consulting Agreement.

## 2. *The Retaliation Claims*

The plaintiff claims that the defendant's deferral of plaintiff's profit-shar-

ing benefits, defendant's requests that the plaintiff not attend trustee meetings, and the defendant's failure to send the plaintiff consulting work constitute retaliatory actions under the ADEA. A plaintiff proves a prima facie case of retaliation when he shows:

"first, protected participation or opposition under [the ADEA] known by the alleged retaliator; second, an employment action or actions disadvantaging persons engaged in protected activities and third, a causal connection between the first two elements, that is, a retaliatory motive playing a part in the adverse employment actions." *Grant v. Bethlehem Steel,* 622 F.2d 43, 46 (2d Cir.1980). "Proof of causal connection can be established indirectly by showing that protected activity is followed by discriminatory treatment." *Id., Bembry v. U.S. Postal Service,* Civil Nos. H–78–513, H–82–944 (D.Conn.1984), Memorandum of Decision, at 28.

The allocation of the burdens and order of production is the same in a retaliation claim as it is in a simple discrimination claim. *Grant, supra.* Once the plaintiff has shown a prima facie case, the defendant may rebut by articulating "legitimate, nondiscriminatory reasons" for the unfavorable employment decisions. *Id.* The burden of persuasion then returns to the plaintiff who must prove, by a preponderance of the evidence "that the employer's reasons are a mere pretext for discrimination taken in retaliation for participation in protected activities." *Id., Bembry, supra,* at 29.

Under this test, the Court holds that the plaintiff has failed to prove a case of retaliation in regard to the non-competition clauses of the Consulting Agreement and the profit-sharing plan for his filing of an age discrimination claim. While the plaintiff satisfied the "minimum requirements of a prima facie case," *Bembry, supra,* at 30, he did not bear his ultimate burden of persuasion regarding pretext.

Filing an age complaint with the Department of Labor, as the plaintiff did on Sep-

tember 15, 1978, is clearly protected activity. The defendant had knowledge thereof. Unfavorable treatment, i.e., the suspension of profit-sharing distributions, the defendant's request that the plaintiff not attend trustee meetings, and the defendant's failure to communicate with the plaintiff regarding consulting jobs, followed the defendant's notice of the plaintiff's claim. The unfavorable employment treatment followed the defendant's notice thereof closely enough so as to allow for a prima facie inference of causal connection. Therefore, the plaintiff has demonstrated a prima facie retaliation case in this respect under the ADEA. *Bembry, supra*, at 31.

However, the defendant has articulated, affirmatively and convincingly, legitimate, non-discriminatory reasons for the actions taken, centering around (1) the plaintiff's contractual obligations under the Consulting Agreement, and (2) the express terms of the profit-sharing plan's non-competition clause itself. The plaintiff, in response, has not persuaded this Court, by a preponderance of the credible evidence adduced, that these reasons were pretextual.

a. *Alleged Retaliation Under the Consulting Agreement*

In consideration for the plaintiff's promise that he act in good faith to maintain the defendant's relationship with its Connecticut labor union clients after his termination (see Defendant's Exhibit P), the defendant dropped the disincentive clause it desired from the Consulting Agreement and replaced it with an incentive clause which the plaintiff favored. *Supra*, at p. 52. The plaintiff, however, breached his promise to act in good faith so as to maintain these clients for the defendant. Instead, the plaintiff undermined the defendant's status, and thus drove these clients away. The plaintiff spread the story from client to client that the defendant was unjustly forcing the plaintiff out of the business. (See Findings of Fact No. 88). Within 18 months of the plaintiff's execution of the Consulting Agreement, the destruction was complete. Virtually all of the plaintiff's former clients had severed their relationship with the defendant. (See Findings of Fact No. 89).

In this context, the defendant's decisions (1) to request the plaintiff not to attend trustee meetings, and (2) to no longer send the plaintiff consulting work were sound business decisions, grounded in economic self-defense, and prompted, not by the plaintiff's ADEA claim, but rather by the plaintiff's breach of his contractual duty to perform in good faith. The Court, therefore, is not persuaded that these decisions were retaliatory in nature.

Neither is the Court persuaded that the defendant's overall enforcement of the non-competition clause was retaliatory, in even a prima facie sense. Throughout the plaintiff's entire employment history with the defendant, the defendant had consistently requested and received similar non-competition promises from the plaintiff. (See Findings of Fact No. 86). The defendant's position regarding the enforcement of these clauses remained the same throughout the entirety of its relationship with the plaintiff, to wit, that the defendant bargained for these clauses and intended to enforce them if the need to do so arose. This position was communicated to the plaintiff throughout his association with the defendant, and thus, prior to his filing a charge with the Department of Labor. (Defendant's Exhibits Q, Z, RR). While the plaintiff, in both 1969 and 1973, sought to have the non-competition clauses deleted (Defendant's Exhibit AF), he appears to have understood them (Defendant's Exhibit AE) and seemed willing, at least at one point, to abide by them. (Defendant's Exhibit AK).

The Court finds no material, credible evidence that the defendant enforced this clause in a retaliatory manner, but rather that the defendant enforced this clause consistently, as it had always told the plaintiff it would do. The defendant sought to enforce this clause whenever the plaintiff attempted to obtain employment with those organizations, which performed work similar to the defendant's, in a manner clearly within the scope of the non-competition clause. The defendant did not enforce the

clause while the plaintiff was employed otherwise by AGC, either before or after he filed his claim. (See Findings of Fact No. 98). The enforcement of a bargained-for contractual provision, within its scope, cannot constitute retaliation.

### b. Alleged Retaliation Under the Profit-Sharing Plan

As mentioned previously, the defendant deferred the plaintiff's distribution under the profit-sharing plan on May 5, 1980. (See Findings of Fact No. 46). A letter sent by the plaintiff's former attorney, Robert F. McWeeny, to the defendant's attorney triggered the deferral. This letter, dated April 15, 1980, informed the defendant that the plaintiff was "in the process of establishing a business" by associating with Insurance Programmers, Inc., to form Louis J. Zebedeo Associates, Inc. (Plaintiff's Exhibit 39). The new entity was to provide "Administrative and Related Services, for Employee Benefit Plans and Other Group Programs." *Id.* In response to this information, the defendant suspended and deferred the plaintiff's profit-sharing distribution. (Plaintiff's Exhibit 27).

Although the plaintiff testified that Louis J. Zebedeo Associates, Inc., never engaged in business of any sort, the defendants were still acting well within their rights under the profit-sharing plan in suspending plaintiff's distributions. The non-competition clause of the profit-sharing plan contemplated and proscribed just the sort of behavior in which the plaintiff was involved. Section 7.11 thereof allowed the defendant to defer benefits to any former employee who "seeks an affiliation with … any … corporation … which shall … (ii) engage in any work or services of the type rendered by [the defendant] within the 5-year period ending on the date of termination of his employment." The kind of work to be performed by Louis J. Zebedeo Associates, Inc., administrative work and related services, was of the type rendered

by the defendant. (Defendant's Exhibit BQ, pp. 142–43). The plaintiff's intention to "establish a business" with Insurance Programmers, Inc., constituted a seeking of an "affiliation" prohibited by § 7.11. Deferral of profit-sharing benefits under age 65 (the Normal Retirement Age) is contemplated by § 7.7. Moreover, the defendant's suspension of plaintiff's profit-sharing benefits was consistent with their interruption of the profit-sharing benefits of Donald Walters and Matthew Ryan, when each aligned himself with organizations performing services similar to those offered by the defendant. Walters, while a member of the protected age class under the ADEA, had not filed an age complaint. Ryan was not a member of the protected age class. Nevertheless, the distributions of both of these former employees were interrupted in much the same way as those of the plaintiff. The deferral of benefits, therefore, is not retaliation. As the Court has previously stated, however, this decision expresses no opinion as to the inherent validity of the non-competition clauses. (See note 7).

Having found neither age discrimination nor retaliation under the ADEA, the Court finds for the defendant, Martin E. Segal Company, Incorporated, on all issues of this case.[10]

The foregoing opinion shall constitute the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

SO ORDERED.

---

**10.** The defendant did not press its contention that the Consulting Agreement was reached in accord and satisfaction for the plaintiff's claims against it in the defendant's post-trial brief. As such, and considering the outcome of the merits of this case, the Court finds it unnecessary to rule upon that issue.