HARTFORD ACCIDENT AND INDEMNITY COMPANY ET AL.
*v.* SOUTH WINDSOR BANK AND TRUST COMPANY

HOUSE, C. J., LOISELLE, BOGDANSKI, LONGO and BARBER, Js.

64

Argued February 10—decision released May 11, 1976

*Daniel P. Cavanaugh,* for the appellant (defendant).

*James A. Kane, Jr.,* with whom, on the brief, was *Albert G. Murphy,* for the appellees (plaintiffs).

LOISELLE, J.   The plaintiffs, the Hartford Accident and Indemnity Company and the Hartford Fire Insurance Company, also known as the Hartford Insurance Group, brought an action in three counts seeking damages for the alleged conversion by the defendant, the South Windsor Bank and Trust Company, of an instrument payable to the plaintiffs.   The court rendered judgment for the plaintiffs and the defendant has appealed.

The following facts were either found by the court or admitted by the defendant in the pleadings: On or about October 13, 1970, the Broadway Bank and Trust Company of Paterson, New Jersey, agreed with the plaintiffs to finance the premium

of an insurance policy to be issued by the plaintiffs for Hartford Poultry, Inc., and Poultry Haulers of Connecticut, Inc., customers of R. W. Belding and Company, Inc., an insurance agency. The financial premium agreement provided that the premium would be paid by a check made payable to the order of the plaintiffs. The agreement also provided that the check was to be delivered to R. W. Belding and Company, Inc., hereinafter referred to as Belding, so that when transmitted from Belding to the plaintiffs it could be handled properly and expeditiously within the offices of the plaintiffs. On October 23, 1970, Broadway Bank and Trust Company issued the check, in the amount of $37,906, and mailed it to Belding. Upon the face of the check were the names of the insured and the insurance agent, Belding, the insurance policy number, and the amount of the gross premium. Upon receipt, Belding's president purported to endorse the check with the words "Hartford Insurance Group" and on October 26, 1970, deposited the check in Belding's business account in the defendant bank. If a check was made payable to the plaintiffs, then the check was to be sent to the plaintiffs and the agent would receive a credit.

At this time Belding owed the defendant bank a substantial sum of money because of delinquencies Belding had in its account. The defendant's executive vice president was made aware that Belding was coming into the bank with a large deposit. On the same day the premium check was deposited, the defendant set off a substantial portion of the check to cover the delinquencies. The defendant did not follow its normal practice of waiting three days before permitting an account to be charged against a deposited check. At the time of the deposit, the

defendant knew that the funds placed in Belding's account were for the purpose of paying insurance premiums to the various carriers that Belding represented. The present check was the only premium check ever deposited by Belding which had been drawn payable to the plaintiffs but purportedly endorsed by Belding or its president. The defendant never inquired to determine whether Belding had authority to endorse the plaintiffs' name on checks payable to the plaintiffs nor did it have on file any such authority. Furthermore, the court specifically found that the defendant was unconcerned with the validity of the endorsement. Before the present action was filed on February 16, 1971, the defendant bank received notice from the plaintiffs that Belding's purported endorsement was unauthorized. The defendant still retains the proceeds of the check.

Belding was an insurance agency that had entered into agency agreements with a number of insurance companies, including the plaintiffs. The plaintiffs had drafted an agreement that authorized Belding to write policies for the plaintiffs, to collect, receive and receipt for premiums on such policies and to retain commissions out of the premiums collected and paid over to the plaintiffs. The agency agreement was devoid of any express provision authorizing Belding to endorse checks made payable to the plaintiffs. It was also devoid of any provision indicating that Belding's obligation to the plaintiffs respecting the handling and payment of premiums was any different with respect to premiums collected in the form of checks payable to the plaintiffs from what it was with respect to premiums collected in cash or in the form of checks payable to Belding. The agreement required Belding to

render monthly accounts of the money due the plaintiffs on the business placed by or through Belding, but it also made provision for the plaintiffs to render a similar accounting. This latter practice was followed. In any event, the balance due was to be paid within sixty days after the end of the month for which the account was rendered.

Belding, in the course of operation as a general insurance agency representing many insurance companies, commonly endorsed and deposited in its banking account premium checks made payable to the insurance companies. Prior to the instance in question, the plaintiffs had no knowledge that Belding was endorsing its name on checks payable to them. The plaintiffs included the premium described in the check, less Belding's commission, in its billing prepared early in December, 1970, for the month ending November 30, 1970.

On January 29, 1971, Belding and another insurance agency entered into an agreement whereby the latter purchased certain assets of Belding and continued Belding's business. They further agreed that a percentage of Belding's commissions obtained through renewals of insurance policies for the period January 29, 1971, to February 1, 1974, would be applied towards liquidation of Belding's indebtedness to the plaintiffs. The plaintiffs agreed not to sue Belding during the term of the agreement. Under the agreement $6231 has been paid to the plaintiffs toward Belding's debt of $49,547.

The court concluded that Belding had no authority to endorse checks made payable to the plaintiffs, that the plaintiffs had not ratified the purported endorsement, and that the defendant converted the

proceeds of the check to its own use. The court awarded, as damages, $37,906, the face amount of the check, with interest. The defendant claims the court erred in concluding as it did.

The second count of the complaint alleges the defendant knew or should have known that the purported endorsement on behalf of the plaintiffs was a forged endorsement and that the defendant converted the check to its own use in violation of General Statutes § 42a-3-419.[1] An unauthorized signature, one made without actual, implied or apparent authority and including a forgery, is inoperative as that of the person whose name is signed. §§ 42a-1-201 (43), 42a-3-404. The unauthorized signature in this case may not constitute a forgery in the strict sense, but the use of the term "forged endorsement" in § 42a-3-419 (1) (c) does not preclude the finding of a conversion. See General Statutes § 42a-1-103; *Coleman* v. *Francis,* 102 Conn. 612, 615, 129 A. 718; *Gilbert* v. *Walker,* 64 Conn. 390, 394, 30 A. 132; *Salsman* v. *National Community Bank of Rutherford,* 102 N.J. Super. 482, 489, 246 A.2d 162 (L. Div.), aff'd, 105 N.J. Super. 164, 251 A.2d 460 (App. Div.); 2 Anderson, Uniform Commercial Code (2d Ed.) § 3-419:4.

---

[1] "[General Statutes] Sec. 42a-3-419. CONVERSION OF INSTRUMENT; INNOCENT REPRESENTATIVE. (1) An instrument is converted when (a) a drawee to whom it is delivered for acceptance refuses to return it on demand; or (b) any person to whom it is delivered for payment refuses on demand either to pay or to return it; or (c) it is paid on a forged endorsement. . . . (3) Subject to the provisions of this title concerning restrictive endorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands. . . ."

No question has been raised as to whether a payee may seek recovery from a depositary bank under § 42a-3-419 for the collection from the drawee based on a forged or unauthorized endorsement of a check. However, see cases cited in annot., 100 A.L.R.2d 670, 677–80; see also 2 Anderson, supra, § 3-419:1; Recent Developments, 74 Col. L. Rev. 104, 104–106.

The court concluded that Belding did not have any authority, express, implied or apparent, to endorse the check. Whether Belding had express or apparent authority is an issue we do not reach because the defendant only claims the existence of implied authority to endorse checks made payable to the plaintiffs.

An authorized representative has the power effectively to endorse an instrument. General Statutes § 42a-3-403. The representative's power to sign for another may be an implied authority. The authority is established by the principles of agency. General Statutes §§ 42a-3-403 (1), 42a-1-103.[2]

"Unless otherwise agreed, an agent is not authorized to execute or to endorse negotiable paper unless such execution or endorsement is usually incident to the performance of the acts which he is authorized to perform for the principal." Restatement

[2] "[General Statutes] Sec. 42a-1-103. SUPPLEMENTARY GENERAL PRINCIPLES OF LAW APPLICABLE. Unless displaced by the particular provisions of this title, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validatng or invalidating cause shall supplement its provisions."

"[General Statutes] Sec. 42a-3-403. SIGNATURE BY AUTHORIZED REPRESENTATIVE. (1) A signature may be made by an agent or other representative, and his authority to make it may be established as in other cases of representation. No particular form of appointment is necessary to establish such authority. . . ."

(Second), 1 Agency § 76, p. 195; see cases cited in annot., 37 A.L.R.2d 453, 479-91; see also 3 Am. Jur. 2d, Agency, § 145; 2A C.J.S., Agency, § 199. The section is consistent with the general law in this state. "This court has stated the general principle as to implied powers incident to the agency relationship in these words: 'The creation of an agency carries with it the usual and appropriate means of accomplishing its object, and clothes the agent with such authority as is proper and necessary to effectuate its purposes.' *Kearns* v. *Nickse,* 80 Conn. 23, 25, 66 Atl. 779." *Zazzaro* v. *Universal Motors, Inc.,* 124 Conn. 105, 108, 197 A. 884. " 'Implied authority is a fact to be proven by deductions or inferences from the manifestations of consent of the principal and from the acts of the principal and agent.' " *Fireman's Fund Indemnity Co.* v. *Longshore Beach & Country Club, Inc.,* 127 Conn. 493, 498, 18 A.2d 347; see *Hotchkiss* v. *DeVita,* 103 Conn. 436, 447, 130 A. 668; *Irving* v. *Shethar,* 71 Conn. 434, 440, 42 A. 258; *Torry* v. *Holmes,* 10 Conn. 499, 513.

The defendant maintains that the authority was implied from the terms of the agency agreement that authorized Belding to write policies for the plaintiffs, to collect, receive and receipt for premiums on such policies, and to retain, out of premiums so collected and paid over to the plaintiffs, commissions at specified rates. The defendant contends that the plaintiffs were aware of this authority because Belding was never told not to endorse premium checks payable to the plaintiffs and because the agency agreement made no distinction between premium checks payable to Belding and premium checks payable to the plaintiffs.

The correctness of the court's conclusion depends on whether it flows logically, reasonably and legally

from the subordinate facts. *Hotchkiss* v. *DeVita,*
supra. It should also be noted that "[i]t is only in
the clearest circumstances, where no other conclu-
sion could reasonably be reached, that the deter-
mination by the trier may be disturbed." *McLaugh-
lin* v. *Chicken Delight, Inc.,* 164 Conn. 317, 323–24,
321 A.2d 456; see 3 Am. Jur. 2d, Agency, §§ 359–360.

The court found that checks payable to the plain-
tiffs were to be sent to the plaintiffs; that the Broad-
way check was the only premium check deposited
by Belding which had been drawn to the plaintiffs
and allegedly endorsed by Belding; and that the
agency agreement did not authorize Belding to
endorse checks made payable to the plaintiffs. The
court could logically and reasonably conclude from
those facts, and from the other facts in the finding,
that no authority existed. Furthermore, the court
did not find that the agent's power to endorse was
either necessary or incident to Belding's perform-
ance of its agency duties. Although these findings
have been attacked, the plaintiffs' appendix supports
these findings. The court's conclusions will not be
disturbed.[3]

In the alternative, the defendant claims the plain-
tiffs ratified Belding's purported endorsement by
silent acquiescence and by acts inconsistent with
repudiation.[4] Those acts consisted of failing to

---

[3] The defendant vigorously argues that the relationship between
the plaintiffs and Belding was creditor-debtor. If the relationship
was as claimed it would have no bearing on the purported endorse-
ment of the check. The trial court found no implied authority. The
second count of the complaint, based upon § 42a-3-419, was found to
have been proved.

[4] "[General Statutes] Sec. 42a-3-404. UNAUTHORIZED SIGNATURE.
. . . (2) Any unauthorized signature may be ratified for all purposes
of this article. Such ratification does not of itself affect any rights
of the person ratifying against the actual signer."

notify Belding that its acts were unauthorized, failing to demand immediately the proceeds of the check and participating in the purchase and sale agreement involving the Belding insurance agency.

"Ratification means the adoption by a person, as binding upon himself, of an act done in such relations that he may claim it as done for his benefit, although done under such circumstances as would not bind him except for his subsequent assent; as where an act was done by a stranger having at the time no authority to act as his agent, or by an agent not having adequate authority. The acceptance of the results of the act with an intent to ratify, and with full knowledge of all the material circumstances, is a ratification." *Ansonia* v. *Cooper,* 64 Conn. 536, 544, 30 A. 760; *Matulis* v. *Gans,* 107 Conn. 562, 566, 141 A. 870; see 3 Am. Jur. 2d, Agency, §160; Restatement (Second), 1 Agency § 82. Silence, as well as affirmative acts, may imply an intent to ratify.

"Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one. *State* v. *Farrah,* 161 Conn. 43, 49, 282 A.2d 879." *State* v. *Bzdyra,* 165 Conn. 400, 403, 334 A.2d 917. The finding indicates that on December 3, 1970, the plaintiffs demanded of Belding all of the debt including that owed on the check. The purchase and sale agreement was intended to provide a continuation of service to the plaintiffs' policyholders and to protect whatever assets Belding had at the agreement's execution. Any forbearance by the plaintiffs during the term of the agreement was of no effect as far as the defendant was concerned. Furthermore, there is no finding that the plaintiffs received a bene-

fit from the endorsed instrument. The subordinate facts support the court's conclusion that the plaintiffs did not ratify Belding's purported endorsement.

The defendant further claims that the plaintiffs discharged the defendant when the plaintiffs suspended their right to sue Belding during the period from January 29, 1971, to February 1, 1974. The defendant contends that the plaintiffs are the holder of the instrument because they are the payee and in possession of it through their agent, Belding, and that, by agreeing not to sue Belding, the plaintiffs discharged all parties, including the defendant, by virtue of General Statutes § 42a-3-606.[5] There is no merit to the defendant's contentions. At the time the plaintiffs agreed not to sue Belding, the instrument had left Belding's possession, and there is no finding that the plaintiffs had possession. The Hartford Insurance Group, therefore, was not the holder and § 42a-3-606 (1) is inapplicable. Cf. *Investment Service Co.* v. *Martin Bros. Container & Timber Products Corporation,* 255 Ore. 192, 465 P.2d 868.

The defendant's final claim is that the court erred in awarding damages in the face amount of the instrument. At the trial the defendant conceded that if the plaintiffs were entitled to recover, they were entitled to recover the full amount of the premium check, less any amount recovered by the plaintiffs under the terms of the purchase and sale agreement on either the premium check or on the indebt-

---

[5] "[General Statutes] Sec. 42a-3-606. IMPAIRMENT OF RECOURSE OR OF COLLATERAL. (1) The holder discharges any party to the instrument to the extent that without such party's consent the holder (a) without express reservation of rights releases or agrees not to sue any person against whom the party has to the knowledge of the holder a right of recourse . . . ."

edness underlying the premium check. At the time of judgment, $6231 had been paid under the purchase and sale agreement on Belding's indebtedness to the plaintiffs of $49,547. The defendant contends that $6231 should be applied proportionately to the premium check and to the balance of the debt of $49,547. Therefore, the amount recovered as damages should be $37,906 less $4767 or $33,139. There is no finding that the plaintiffs agreed to this concession on the part of the defendant. The court concluded that the money recovered under the agreement was appropriately allocable to other indebtedness of Belding to the plaintiffs and that the money did not constitute payment pro tanto of the defendant's liability for the face amount of the premium check.

There is no error.

In this opinion the other judges concurred.