[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a foreclosure action which the court heard on a contested basis. The plaintiff, Vito DiLustro, held a mortgage on property at 8 Svea Avenue, Branford, Connecticut, which was owned by the defendant, John S. Horvat, Sr. (hereinafter referred to as the defendant Horvat). That mortgage is the subject matter of this suit. The defendant, Harbor National Bank of Connecticut, also has a mortgage on said property in the amount of $100,000.00, dated June 30, 1989. The defendant, Horvat, cross complained against the third-party defendants, Edward Botwick and John DiLustro. The defendant, Edward Botwick (hereinafter called defendant Botwick), is an attorney licensed to practice law in Connecticut who represented the plaintiff in various legal matters over a period of years. The defendant, John DiLustro (hereinafter called defendant DiLustro), is the son of the plaintiff, Vito DiLustro. The defendant, Horvat, filed an answer to the plaintiff's complaint and three special defenses to the matter. In addition, the defendant Horvat has filed a nine-count CT Page 10723 counterclaim against the plaintiff alleging that Attorney Botwick was the agent of the plaintiff at all times pertinent to this action. The causes of action alleged in that counterclaim are as follows:
First Count — Failure to provide a release of mortgage;
 Second Count — A claim under Connecticut General Statutes 49-8c;
Third Count — Abuse of process claim;
Fourth Count — Fraud claim;
Fifth Count — Negligent misrepresentation claim;
Sixth Count — Unjust enrichment claim;
 Seventh Count — Intentional infliction of emotion distress claim;
 Eighth Count — Breach of covenant of good faith and fair dealing claim;
 Ninth Count — Claim under Connecticut's Unfair Trade Practices Act.
The defendant Horvat has also filed an eight-count cross complaint against the defendant Botwick and a one-count cross complaint against the defendant DiLustro alleging that they were the agents of the plaintiff. The legal theories of said cross complaint against the defendant Botwick are as follows:
 First Count — Failure to provide a release of mortgage claim;
Second Count — Claim for fraud;
Third Count — Claim for negligent misrepresentations;
 Fourth Count — Claim for international infliction of emotional distress;
 Fifth Count — Claim for breach of implied covenant of good faith and fair dealing;
Sixth Count — Claim for negligence;
Seventh Count — Claim for breach of fiduciary duty; CT Page 10724
 Eighth Count — Claim under Connecticut's Unfair Trade Practices Act.
The defendant Botwick filed a cross complaint against the plaintiff and the defendant DiLustro alleging he was acting as their agent and under their direction at all times. All of the parties filed the appropriate answers to the cross complaints and counterclaim.
The defendant, Harbor National Bank of Connecticut (hereinafter referred to as Harbor), filed an answer and special defense to the plaintiff's complaint, and the plaintiff filed a special defense to the defendant Botwick's cross complaint.
On June 28, 1985, the plaintiff sold a piece of commercial real estate with the improvements thereon at 8 Svea Avenue, Branford, Connecticut, to the defendant Horvat for $155,000.00. The plaintiff took back a mortgage as evidenced by a promissory note signed by the defendant Horvat in the amount of $135,000.00 relative to this sale. (Exhibits A and B). The plaintiff's attorney for this transaction was the defendant Botwick who prepared, amongst other documents, the amortization schedule relative to the aforementioned promissory note. The plaintiff came to the United States from Italy in 1958 and has since worked in the jewelry business, both in Italy and this country. He has operated his own jewelry business in the United States since 1973. The defendant Horvat is a master machinist who came to the United States from Czechoslovakia in 1969. He and the plaintiff have known each other since at least 1984 and consider themselves to be good friends according to their testimony. Both the plaintiff and the defendant Horvat impressed the court with their business acumen and knowledge of real estate transactions. It was testified to that the plaintiff often left the State of Connecticut for various periods of time when he went to Florida or Italy. The defendant Horvat always made his mortgage payments to the plaintiff by mailing to or personally delivering said payments to the plaintiff's place of business in East Haven, Connecticut. and that if the plaintiff was away these payments were made to and accepted by his son, the defendant John DiLustro. However, all such payments were made payable to the plaintiff only. There were occasions when the plaintiff's son either stamped or endorsed these mortgage payment checks when he deposited them in the plaintiff's bank account. This was done with the knowledge and authority of the plaintiff. Mr. Horvat testified that he put the subject property on the market for sale in 1986 and it remained for sale from that time until it was sold. He testified that the plaintiff knew what was going on with the subject property at all times. In May, 1988, the subject property was not rented and the plaintiff agreed that the defendant Horvat would only have to make interest payments monthly thereafter and not payments on principal CT Page 10725 as was the case before that date. (Exhibit E). On May 1, 1988, there was $93,431.28 due on the principal of said promissory note. In the spring of 1989, the defendant Horvat testified that he told the plaintiff that the property would probably be sold and asked what should he do if the plaintiff was out of the country when a sale took place. The plaintiff replied that Horvat should see his son as the plaintiff would be in touch with his son at all times.
On June 8, 1989, the defendant Horvat signed a sales agreement with Peter and Douglas Baldwin to sell the subject property (Exhibit 24) for $255,000.00, with the defendant Horvat taking back a second mortgage of $154,000.00 as part of the purchase price. That second mortgage was to be subordinated to a first mortgage of $100,000.00 of the defendant Harbor. The defendant Horvat retained Attorney Stephen Hanchuruck to represent him in this sale. The purchasers retained Attorney John Dillon to represent them. Mr. Horvat instructed Attorney Hanchuruck to contact the plaintiff's son concerning the release of mortgage necessary for the property closing because the plaintiff was then in Italy. Attorney Hanchuruck did this and was told by the plaintiff's son to call the defendant Botwick. Mr. Hanchuruck testified he called Mr. Botwick to inform him of the closing and to seek a payoff figure. Mr. Botwick gave him a payoff figure of $62,554.59 which would have been correct if the principal was paid according to the original amortization schedule. Mr. Hanchuruck stated to Mr. Botwick that the balance was approximately $94,000.00. Mr. Botwick then said he would check it and get back to Mr. Hanchuruck.
The defendant Edward Botwick has been an attorney in Connecticut since 1973. Since 1978 he has represented members of the plaintiff's family, friends of the plaintiff, and the plaintiff himself in various legal matters. Between 1983 and 1986 Attorney Botwick represented the plaintiff in seven real estate transactions and represented the plaintiff on another matter as late as June 1989. Mr. Botwick testified that sometime in mid June 1989 he talked to the plaintiff's son on the telephone. He was not sure who initiated the call, he or John DiLustro. He questioned the plaintiff's son about the payoff figure for Horvat's mortgage and whether he (the son) had a power of attorney to act for his father (the plaintiff) in this matter. He stated the plaintiff's son did not know the mortgage payoff figure and did not have a power of attorney from his father. According to Mr. Botwick, he told the plaintiff's son to call the plaintiff and have the latter call him (Attorney Botwick). Mr. Botwick testified that sometime between June 25, 1989 and June 30, 1989, the plaintiff called him and gave him the same payoff figure as Attorney Hanchuruck had given him. He testified that he asked the plaintiff what to do with the closing proceeds since he could not give them to his son, and the plaintiff said invest it in CT Page 10726 certificates of deposit at six or seven percent or in a savings account. Mr. Botwick then told the plaintiff about investing in mortgages through the MMM Mortgage Company which earned twelve (12%) percent to eighteen (18%) percent interest. He told him mortgages at twelve (12%) percent were safer than the more riskier mortgages of eighteen (18%) percent. Mr. Botwick testified the plaintiff agreed to such investments with the funds from the payment of Mr. Horvat's mortgage. The defendant Botwick testified that he asked the plaintiff which mortgages he should invest the payoff mortgage funds in and he was told to use his discretion. Mr. Botwick then told the plaintiff he would spread out the funds into various mortgages. He said the plaintiff liked the rates. The plaintiff denied this telephone conversation between he and the defendant Botwick ever took place. Mr. Botwick testified that during this call he said he would send a release of mortgage to the plaintiff in Italy by Federal Express for him to sign. However, according to Mr. Botwick, the plaintiff declined this offer and said he would sign the release of mortgage when he returned home in August, 1989.
Mr. Botwick testified that the MMM Mortgage Company was formed by him at the request of some of his clients so that they would have a vehicle in which to invest monies. Mr. Botwick said he operates this company and his only payment is derived from points received when a mortgage is placed by the company. He is the sole shareholder of the corporation and he and his wife are the only officers of the corporation.
On June 30, 1989, the closing took place on the subject property, whereby Douglas and Peter Baldwin purchased the property from the defendant Horvat for $255,000.00. Harbor National Bank of Connecticut loaned the purchaser $100,000.00, secured by a first mortgage on the property and the defendant Horvat took back, a second mortgage for $154,000.00 as part of the transaction. At the closing, Attorney Hanchuruck, representing Mr. Horvat, sent a check to Mr. Botwick as attorney for the plaintiff, for $94,365.59 as full payment on the mortgage balance due to the plaintiff from Mr. Horvat. (See Exhibit C). On July 5, 1989, Mr. Botwick sent a letter to Attorney Hanchuruck acknowledging that he had received the check for $94,365.59 and was holding the same in escrow. (See Exhibit D). Both Attorney Hanchuruck and Attorney Botwick agreed that the latter was to hold said funds in escrow until Mr. Hanchuruck received a release of mortgage signed by the plaintiff. The plaintiff testified he was in Italy from May 15, 1989 to October 5, 1989. Shortly after receiving the payoff check, Attorney Botwick invested all of the funds but $3,140.26 in. mortgages held by the MMM Mortgage Company. (See Exhibits F, G and H). The aforementioned $3,140.26 was put in an escrow savings account by Attorney Botwick. Attorney Hanchuruck testified he had no idea that the full amount of his check was not being held in CT Page 10727 escrow in a savings account until sometime later.
The plaintiff testified that he first learned that Attorney Botwick had received the Horvat mortgage payoff funds in August, 1989, when he called him from Italy for a Sylvester Capuano. Mr. Capuano was a friend of the plaintiff who was involved in an accident in Connecticut in approximately January, 1989. At the recommendation of the plaintiff, Mr. Capuano retained Attorney Botwick to represent him for the injuries he received in that accident. In August, 1989, the plaintiff stated he was with Mr. Capuano in Italy and was asked to call Attorney Botwick to see how said case was proceeding. Mr. Capuano did not speak English. The plaintiff testified that during that call he learned for the first time that Attorney Botwick had received the subject mortgage funds. He stated Attorney Botwick told him he had invested said funds at seventeen (17%) percent. The plaintiff stated he asked Attorney Botwick if he could get those monies when he returned to the United States and he was told "no problem." (See Exhibit 9).
The plaintiff returned from Italy on October 5, 1989. He testified he tried to see Attorney Botwick immediately but could not until November 10, 1989. He wanted to see Attorney Botwick in order to receive the Horvat mortgage monies. He felt Attorney Botwick was avoiding him. Attorney Botwick testified he saw the plaintiff as soon as he could but that he was sick with the flu and then was on trial for ten days. When the plaintiff finally did see Attorney Botwick it was on a Friday afternoon. He gave the plaintiff eight to ten interest checks from the mortgages into which he had invested and the documentation relative to those mortgages. The plaintiff signed a release of mortgage and left Mr. Botwick's office. Attorney Botwick then wrote a letter to Attorney Hanchuruck enclosing the release of mortgage. (See Exhibit 19). Before he could mail out said release, Mr. Botwick testified that the plaintiff returned to his office and threw all of the checks and documents at him which he (Botwick) had previously given to him (plaintiff) and said he wanted to think about it and would be back on Monday, and that he demanded back the release of mortgage he signed. The plaintiff testified that he returned to Mr. Botwick's office and demanded the return of the release of mortgage he signed and stated to Attorney Botwick he would give him the release of mortgage when he received his money. Attorney Botwick returned the release of mortgage to the plaintiff as the latter had demanded. Attorney Botwick testified that he then took the documents home over the weekend and found that there were errors in the mortgages (Exhibits F, G and H), which he corrected and which are represented by Exhibits 3, 4, 5 and 6.
Since that date, namely November 10, 1989, the defendant Botwick has held the interest checks due the plaintiff as the plaintiff refuses to accept them. These checks total $28,121.35 CT Page 10728 as of November 11, 1991. (See Court's Exhibits 1 and 2). The court ordered this sum be put in an escrow account with Attorneys Nadel (plaintiff's attorney), Foley (Horvat's attorney), and Botwick as the trustees of that account.
The defendant Horvat has since repurchased the subject property from the persons to whom he sold it, namely Douglas Baldwin and Peter Baldwin, in accordance with "Addendum A" to the sales contract between those parties. (Exhibit 24).
The plaintiff is claiming the mortgage due from the defendant Horvat is in default and is seeking a foreclosure by sale of that mortgage. The plaintiff refuses to give the defendant Horvat a release of mortgage until he receives all of the funds due him from the aforesaid mortgage. The defendants Horvat and Harbor National Bank of Connecticut claim that the plaintiff received full payment for said mortgage when the aforesaid payment was made to the defendant Botwick. One of the issues here is whether or not the defendant Edward Botwick was acting as the plaintiff's agent when he received the funds to pay off the subject mortgage from the attorney for the defendant Horvat.
The court would state here that a complaint was filed with the Attorneys Grievance Committee by the plaintiff Vito DiLustro against Attorney Edward Botwick and that that complaint is now being heard by another superior court judge.
There are three elements required to show the existence of an agency relationship. They include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance that the agent will act for him; and (3) an understanding between the parties that the principal will be in control of the undertaking. Botticello v. Stefanovicz, 177 Conn. 22, 25. When an agency relationship is claimed to exist, it must be proved by a fair preponderance of the evidence. Leary v. Johnson, 159 Conn. 101,105. "Apparent authority is derived not from the acts of the agent but from the deliberate or inadvertent acts of the principal. . . ." Apparent authority has two elements. First, it must appear from the acts of the principal that "the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted him to act as having such authority. . . ." Second, the party seeking to bind the principal must have acted in good faith reliance on that appearance of authority. Courts have developed the doctrine of apparent authority "to protect, under proper circumstances, a third person in his dealings with an agent who lacks express authority." Edart Truck Rental Corporation v. B. Swirsky Co.,23 Conn. App. 137, 139-140.
Ratification means the adoption by a person as binding upon CT Page 10729 himself, of an act done in such relations that he may claim it as done for his benefit, although done under such circumstances as would not bind him except for his subsequent assent; as where an act was done by a stranger having at the time no authority to act as his agent, or by an agent not having adequate authority. The acceptance of the results of the act with an intent to ratify, and with full knowledge of all the material circumstances is a ratification. Hartford Accident Indemnity Co. v. S. Windsor Bank Trust Co., 171 Conn. 63, 72.
Here the court finds that at all relevant times the defendant Botwick was acting as the agent for the plaintiff Vito DiLustro. There is no question that the plaintiff knew that the subject property would in all likelihood be sold while he was in Italy. He told Horvat to call his son, the defendant John DiLustro, if a sale was to take place while he was in Italy as he and his son would be contact with each other at all times. The plaintiff testified he told his son to take the defendant Botwick to the property closing with him. Why would he tell his son this if he. did not intend to have Mr. Botwick act as his agent and/or attorney? The court finds that in doing this the plaintiff wanted to be sure that he received the correct payoff figure for the mortgage and that his interests were protected. The plaintiff's son at that time was a young man and not very much involved with his father's (plaintiff) real estate holdings. The plaintiff testified he knew that his mortgage could not be released unless he signed a release of mortgage. He also knew or should have known that Mr. Horvat would not pay off the mortgage the plaintiff held until he received such a release. The plaintiff testified that he could have flown to the United States in eight hours if he knew when the closing was going to take place. There is no question the plaintiff's son knew when it was to be held and there is no dispute that Attorney Botwick was in contact with John DiLustro. Further, there is no dispute that the plaintiff and his son were in contact with each other when the plaintiff was in Italy during this time period. From the evidence the court finds that the plaintiff, Vito DiLustro, knew when the closing was going to take place or at the very least could have easily found out by making a phone call to Attorney Botwick and/or John DiLustro. However, assuming arguendo that the plaintiff did not know the date of the closing, then in August when he admitted he learned, from Mr. Botwick that the closing had taken place, why did he not then take appropriate action? He could have demanded from Mr. Botwick the full amount of mortgage funds but he did not. He just wanted assurances that he could receive his money when he returned to the United States. He testified he was very good friends with Mr. Horvat. If the defendant Botwick had no authority to receive the mortgage proceeds, why did not the plaintiff contact Horvat or have his son tell him the funds should not have been paid to Botwick? Why didn't he fly home as he said he could? Why didn't CT Page 10730 he tell Mr. Botwick that he had no authority to receive his funds from the subject mortgage payoff? The plaintiff took none of the above actions nor any other action that he could have and should have taken if Mr. Botwick did not have authority to receive said funds. The fact he did nothing for at least five weeks after he spoke to Attorney Botwick on the telephone from Italy in August 1989 ratifies the act of Attorney Botwick in accepting the mortgage payoff funds from Attorney Hanchuruck. There is no plausible explanation for the plaintiff's actions after that date relative to the release of mortgage other than Mr. Botwick was his agent not for investing his funds but for accepting and receiving them.
Therefore, this court denies the plaintiff's claim for a foreclosure of the property at 8 Svea Avenue, Branford, Connecticut. The court finds that the defendant, Edward Botwick, was acting as the plaintiff's agent when he accepted payment of $94,365.59 from Attorney Stephen Hanchuruck to pay off the defendant Horvat's mortgage relative to the subject property. Further, the court finds that the promissory note and mortgage dated June 28, 1985 (Exhibits A and B), have been paid in full by the defendant Horvat. This occurred when Attorney Hanchuruck forwarded his check for $94,365.59 to Attorney Botwick and the latter accepted said check.
The court orders that the plaintiff shall return the original mortgage deed and promissory note to the defendant Horvat forthwith.
The court orders that the plaintiff shall provide forthwith a release of mortgage to the defendant Horvat discharging the mortgage he holds on the property at 8 Svea Avenue, Branford, Connecticut. The court also orders that the Lis Pendens now on the Branford land records as a result of this lawsuit is hereby discharged.
The defendant Horvat also is making a claim under Connecticut General Statutes 49-8(c). That statute reads as follows:
 (c) If the mortgagee or plaintiff or his attorney, as the case may be, fails to execute and deliver a release after thirty days from the date of a written request for a release of such encumbrance sent to him at his last-known address by registered mail or by certified mail, postage prepaid, return receipt requested, the mortgage or plaintiff shall be liable for damages to any person aggrieved at the rate of two hundred dollars for each week after the expiration of such thirty days or in an amount CT Page 10731 equal to the loss sustained by such failure to execute and deliver a release, whichever is greater.
There was testimony and the court finds that a certified letter was sent to the plaintiff by Attorney Stephen Hanchuruck on May 10, 1990, requesting a release of mortgage in accordance with the aforementioned statute. (Exhibit 7). The court does not order that the plaintiff shall pay to the defendant Horvat any sums in accordance with the provisions of Connecticut General Statutes 49-8(c) because the plaintiff has not proven any damages against the plaintiff Vito DeLustro that would be compensable under this statute.
The defendant Horvat is also seeking attorney's fees which the court does not order that the plaintiff shall pay to him. (Exhibit 25).
The defendant Horvat claims punitive damages and damages for emotional distress. He testified that as a result of this lawsuit he was not able to attend the funeral of his brother and sister in, Czechoslovakia. He also claims that he will have to pay $17,000.00 in capitol gains taxes in one lump sum due to his repurchase of the subject property from Douglas and Peter Baldwin. He testified that if he did not have to repurchase said property, those taxes could have been paid over a period of years. The court does not find that the defendant Horvat sustained his burden of proof on these claims for damages. The defendant Horvat also testified that Peter and Douglas Baldwin did not request that he repurchase the property under the addendum to the sales contract between the parties until this foreclosure action was instituted. (Exhibit 24). If Mr. Horvat is claiming damages for the repurchase, the court does not award any such damages because he has not sustained his burden of proof on these damages either.
As to the remaining counts in the defendant Horvat's counterclaim, the court finds that the defendant did not sustain his burden of proof on these counts.
The court finds that the defendant Horvat did not sustain his burden of proof in his cross complaint as to the defendant, John DiLustro.
The court finds that the defendant Horvat did sustain his burden of proof as to counts two (Fraud) and seven (Breach of a Fiduciary Duty) in his cross complaint against the defendant Botwick. The essential elements of an action in fraud are that a false misrepresentation was made as a statement of fact; that it was untrue and was known to be untrue by the party making it; that it was made to induce the other party to act on it; and that he did so to his injury. Paiva v. Vanech Heights Construction Co., CT Page 10732159 Conn. 512, 515. Although the general rule is that a misrepresentation must relate to an existing or past fact, there are exceptions to this rule, one of which is that a promise to do an act in the future, when coupled with a present intent not to fulfill the promise, is a false representation. Ibid. Here the defendant Botwick represented to Stephen Hanchuruck, attorney for Mr. Horvat, that he would hold his check in escrow until he received a release of mortgage from the plaintiff and forwarded the same to him (Hanchuruck). Within five days Mr. Botwick began investing said mortgage proceeds into the MMM Mortgage Company. To this date he has never received the release of mortgage which conditioned the release of the escrow funds. Attorney Hanchuruck would not have forwarded his check for $94,365.59 to Attorney Botwick if he knew said funds were not going to be held by him (Botwick) until he forwarded a release of the mortgage back to him (Hanchuruck).
In the seventh count of his cross complaint against the defendant Botwick, the defendant Horvat alleges a breach of a fiduciary duty. A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the, other. Dunham v. Dunham, 204 Conn. 303, 322. The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him. Ibid. Proof of a fiduciary relationship, therefore, imposes a twofold burden upon the fiduciary. Once a fiduciary relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary. Ibid. Furthermore the standard of proof for establishing fair dealing is not the ordinary standard of fair preponderance of the evidence, but requires proof either by clear, and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence. Ibid., 322, 323. Here Mr. Horvat established that there was a fiduciary relationship between himself and Attorney Botwick. The burden then shifted to Mr. Botwick to prove by clear, convincing and unequivocal evidence that he had dealt fairly with Mr. Horvat and in this court's opinion this was not done by Mr. Botwick for the same reasons as hereinbefore stated.
The defendant Horvat seeks attorney's fees in the amount of $21,200.00, plus costs of $103.80, for a total of $21,303.80 (Exhibit 25). Punitive or exemplary damages in a fraud case, includes attorney's fees. Wedig v. Brinster, 1 Conn. App. 123,124. Punitive damages are limited to the costs of litigation, less taxable cost. Ibid. The court orders that the defendant Botwick shall pay to the defendant Horvat the sum of $10,303.80 as punitive damages. CT Page 10733
"Where . . . an agent . . . commits or participates in the commission of a tort, whether or not he acts on behalf of his principal . . . he is liable to third persons injured thereby." Maturo v. Gerard, 196 Conn. 584, 588.
As to the other claims of damages of the defendant Horvath, the court finds he did not sustain his burden of proof relative to them as to the defendant Botwick.
As to the Harbor National Bank of Connecticut, the court finds the issues for said bank relative to its special defense.
As to the cross complaint of the defendant Botwick against the plaintiff Vito DiLustro, and John DiLustro, the court finds that the defendant Botwick was acting as the agent of the plaintiff, Vito DiLustro, for the acceptance of the aforesaid mortgage payoff check. The court makes no finding if the said defendant Botwick was acting as the plaintiff Vito DiLustro's agent when he invested said mortgage funds in the mortgages held by the MMM Mortgage Company as this issue was not before this court. The court makes no findings as to whether there is any liability between the defendant Botwick and the plaintiff as that issue was also not before the court. The defendant Botwick did not sustain his burden of proof in his claim that he was acting as the agent for the defendant, John DiLustro.
The defendant Botwick is holding the balance of the mortgage proceeds in an escrow bank account which amount is $3,140.26, plus any accrued interest. This sum shall be paid to the plaintiff forthwith.
The court orders that the $28,121.35 now being held in escrow, which represents interest earned on the mortgages purchased with the plaintiff's funds as hereinbefore mentioned, shall be paid to the plaintiff forthwith.
Judgment may enter accordingly.
WILLIAM J. SULLIVAN, JUDGE