**In re Sherry L. MASON, Debtor.**

**Sherry L. Mason, Plaintiff,**

**v.**

**Arizona Education Loan Marketing Assistance Corp. a/k/a AELMAC and Educational Credit Management Corp., Defendants.**

**Bankruptcy No. 96–32402(ASD).
Adversary No. 00–3134.**

United States Bankruptcy Court,
D. Connecticut.

Oct. 10, 2003.

Christopher C. Noble, Noble & Associates, LLC, Plainville, CT, for Plaintiff.

Sheila A. Denton, Pullman & Comley, LLC, Bridgeport, CT, for Defendant, Educational Credit Management Corp.

## MEMORANDUM OF DECISION

ALBERT S. DABROWSKI, Chief Judge.

### I. INTRODUCTION

In this adversary proceeding the Debtor–Plaintiff seeks relief from certain student loan obligations pursuant to

Bankruptcy Code Section 523(a)(8) and applicable non-bankruptcy law. For the reasons stated more fully herein, the Court will enter judgment in the Plaintiff's favor.

## II. JURISDICTION

The United States District Court for the District of Connecticut has subject matter jurisdiction over the instant adversary proceeding by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1). This is a "core proceeding" arising under, and arising in a case under, Title 11, pursuant to 28 U.S.C. § 157(b)(2)(I) and (O).

## III. PROCEDURAL HISTORY

On July 17, 1996, the Debtor–Plaintiff, Sherry L. Mason, commenced the underlying bankruptcy case through the filing of a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code. Within that case she instituted the instant adversary proceeding through the filing of a three-count Complaint seeking the following declarations from this Court: (i) that certain student loan debts are dischargeable pursuant to 11 U.S.C. § 523(a)(8) (1996) (Count I); (ii) that a certain "consolidation" loan is void (Count II); and (iii) that certain student loan debts are dischargeable, in whole or part, pursuant to applicable non-bankruptcy law, to wit: 34 C.F.R. 682.402(d) (1994) (Count III).

On November 22, 2000 this Court ordered the substitution of Educational Credit Management Corp. (hereafter, "ECMC") for the former Defendant, United Student Aid Funds. Defendant ECMC then filed a timely Answer to the Complaint;[1] and on August 16, 2002, trial was held on Counts I and II of the Complaint.[2]

Having received and reviewed the trial evidence in this proceeding—both documentary and testimonial—as well as the post-trial briefs filed by the parties, the Court now issues this Memorandum of Decision, which shall constitute its Findings of Fact and Conclusions of Law.

## IV. FACTUAL BACKGROUND

The obligations at issue in the instant adversary proceeding have their origin in two loans procured by the Plaintiff at or near the time of her enrollment in an accelerated business administration and accounting program at Barnell College (hereafter, "Barnell") located in Nashville, Tennessee in 1987.[3] To finance this endeavor the Plaintiff obtained two educational loans totaling approximately $8,000.00 (hereafter, the "Original Debt"). The record is silent as to the identity of the lender on the Original Debt, although they appear to have been guaranteed by the federal government.[4]

Due to a personal tragedy, the Plaintiff withdrew from Barnell not later than July, 1987, without completing her degree program. Her subsequent efforts to obtain from Barnell an accounting of, or other information concerning, the Original Debt

---

1. The Defendant Arizona Education Loan Marketing Assistance Corp. has failed to appear or plead in this adversary proceeding, and has further failed to defend at trial.

2. Count III was withdrawn by the Plaintiff prior to trial.

3. Prior to her enrollment at Barnell, the Plaintiff had achieved only a high school equivalency degree.

4. The Plaintiff testified that she was provided completed loan forms by Barnell employees on campus. According to her, these documents merely required her signature to effect the educational financing she desired.

were unavailing. Similarly unavailing were her attempts to obtain a transcript or other educational records from Barnell. The Plaintiff's difficulties in obtaining information from Barnell may be attributable to the school's closure in the early 1990's, and the fiscal and administrative dislocation which likely led up to that closure.

Prior to 1995, the Plaintiff appears to have made no payments to any entity on the Original Debt. After a number of years of inactivity the Plaintiff started receiving frequent collection calls regarding the Original Debt. The Plaintiff testified that the phone calls came from people who identified themselves only by their first names—"John" or "Bob" (hereafter, the "Callers"). The Plaintiff does not remember the Callers ever identifying the lending institution(s) they represented, only that they represented the federal government, and were calling on behalf of the educational lending institutions holding her loans.[5]

The Callers sought to convince the Plaintiff to enter into a loan consolidation agreement and begin repayment of her loan obligations. They misrepresented and threatened, *inter alia*, that if she did not enter into a new, consolidated loan agreement and begin paying back her student loans, she would be subject to arrest and federal incarceration (hereafter, the "Threats").[6]

Out of fear of incarceration the Plaintiff eventually succumbed to the Callers' pressure; she agreed to consolidate and refinance her outstanding student loan obligations, and begin making payments thereon. On July 20, 1995, the Plaintiff executed a "Loan Consolidation Application and Promissory Note" (hereafter, the "Note/Application") by which she allegedly obligated herself to the consolidating lender, Arizona Education Loan Marketing Assistance Corp. a/k/a Southwest Student Services Corporation (hereafter, "AELMAC") in an amount in excess of $12,500.00, amortized over 15 years at an interest rate of 9% (hereafter, the "Consolidation Debt").

The Note/Application was presented to the Plaintiff by mail for execution. At that time it was simply a pre-printed form *in blank*, except for certain handwritten personal information, which the Plaintiff apparently had furnished over the phone at the time she acquiesced to the Consolidation Debt. Only after the Plaintiff signed the Note/Application in blank, and returned it as instructed, were the identity of the consolidating lender—AELMAC—and the financial terms of the Consolidation Debt placed onto the document.

After remitting several monthly installments on the Consolidation Debt, the Plaintiff fell into payment default. As a result of the default, United Student Aid Funds, Inc. (hereafter, "USAF") paid off the Consolidation Debt pursuant to its guaranty of AELMAC, and by subrogation and/or assignment became the holder of the Note/Application, and thereby the owner of the Consolidation Debt. Roughly contemporaneous with the commencement of this adversary proceeding ECMC ac-

---

**5.** The record supports a finding that the Callers were employees of Diversified Collection Services of San Leandro, California (hereafter, "Diversified").

**6.** According to the Plaintiff, "[t]hey kept telling me that they represented the federal government and that if I would sign papers I wouldn't go to jail. Because they kept telling me they were going to send federal marshal's [sic] and I would be arrested and put in federal prison for not paying back my student loan. And then they sent me these papers to sign to start repaying the loan." Tr. at 18.

quired, by assignment from USAF, all rights in and to the Consolidation Debt.

## V. DISCUSSION

Two Counts of the Complaint remain in issue: (i) Count I—which requests a determination of non-dischargeability of the Original Debt under former Bankruptcy Code Section 523(a)(8) and (ii) Count II—which seeks a declaration that the Consolidation Debt is null and void as obtained through duress. For the purpose of clarity the Court's analysis of these Counts shall be presented in reverse order.

## A. Count II—Voiding of Consolidation Debt.

■ In Count II of the Complaint the Plaintiff contends that the Consolidation Debt should be declared null and void because she entered into the underlying agreement under duress. The issues raised by this loan avoidance claim are governed by local rather than federal law. *Cf. Zebedeo v. Martin E. Segal Company, Inc.,* 582 F.Supp. 1394, 1416, fn. 9 (D.Conn. 1984). Given that the Consolidation Debt was solicited, and the Application/Note executed, in Connecticut, the rules of decision on Count II are properly supplied by Connecticut law.

### 1. Burden of Proof.

■ As the party seeking to avoid a signed contract, the Plaintiff bears the ultimate burden of proving the requisite elements of duress. Although there appears to be no Connecticut authority stating the applicable standard of proof in cases such as the one at bar, this Court determines that duress must be shown by clear and convincing evidence. *See* 25 Am.Jur.2d, Duress and Undue Influence § 28 (1996).

### 2. Elements of Duress.

■ Duress has been described as "any wrongful threat of one person by words or other conduct that induces another to enter into a transaction under the influence of such fear as precludes him from exercising free will and judgment, if the threat was intended or should reasonably have been expected to operate as an inducement." Restatement (First) of Contracts § 492(b) (1932). A contract obtained through duress is *void ab initio,* and therefore unenforceable. *See Zebedeo, supra,* at 1417. The Connecticut authorities state the elements of a duress claim in various ways. *Compare McCarthy v. Tanska,* 84 Conn. 377, 80 A. 84, 86 (Conn. 1911) ("The question in each case is: was the alleged injured person, by being put in fear by the other party to the transaction for the purpose of obtaining an advantage over him, deprived of the free exercise of his own will power, and was such advantage thereby obtained?"); *Noble v. White,* 66 Conn.App. 54, 59, 783 A.2d 1145 (2001) (For a party to demonstrate duress, it "must prove [1] a wrongful act or threat [2] that left the victim no reasonable alternative, and [3] to which the victim in fact acceded, and that [4] the resulting transaction was unfair to the victim."); and *Zebedeo, supra,* at 1417 (duress is "one party's wrongful conduct [which] strips the other party of his or her free will for the purposes of obtaining a contract . . . .").

The foregoing principles may be fairly synthesized into the following elemental statement: duress consists of (i) a wrongful threat, (ii) which stripped a contract party of free will to refuse to assent to the subject contract, (iii) which contract in fact resulted in unfairness to that party.

### a. Wrongful threat.

■ The Court concludes that the Plaintiff presented clear, convincing and

unrebutted evidence that the Callers utilized "wrongful" threats in their solicitation of the Consolidation Debt. The Restatement makes clear that a threat of "criminal prosecution" is wrongful. *See* Restatement (Second) of Contracts § 176(1)(b) (1981). The nature of the threats in this case went beyond even criminal prosecution; the Callers sought to convince the Plaintiff that federal authorities could summarily incarcerate her for having delinquent student loan debt. There can be no doubt that this type of solicitation through intimidation was "wrongful".

### b. Lack of free will.

The Plaintiff has also convinced this Court that the Callers' threats stripped her of free will in connection with her assent to the Consolidation Debt. Plainly, the Callers induced in the Plaintiff a "fearful state of mind", *Zebedeo, supra,* at 1417. The Plaintiff testified credibly of the overwhelming anxiety produced by the Callers' threats. That account was credibly corroborated by witness Diane Gaudreau—the Plaintiff's roommate at all relevant times—who testified that when the Plaintiff spoke with the Callers she would often experience anxiety attacks. Specifically, Ms. Gaudreau testified that at these times the Plaintiff—

> "... couldn't breath. [She was p]acing around and [I] just ... [had] to keep talking to her to try to get her to calm down. Try to reassure her that she wasn't going to go to jail. You know, hopefully wasn't going to go to jail. But she would have to take some medication. After a while it got so that the anxiety attacks were getting worse and the doctor put her on medication."

Tr. at 102.

Certainly, most people with legal training, and many without, would have understood that the Callers' threats could not have been executed—a borrower cannot be arrested, much less imprisoned, for student loan delinquency and/or failure to cooperate in the collection of such obligations. Thus the Plaintiff might be fairly characterized as particularly naive and gullible. However, the legal standard for duress is essentially subjective. The fundamental question is whether the threat *actually* induced assent, not whether succumbing to the threat was objectively reasonable. As the Restatement commentary observes:

> Threats that would suffice to induce assent by one person may not suffice to induce assent by another. All attendant circumstances must be considered, including such matters as the age, background and relationship of the parties. Persons of a weak or cowardly nature are the very ones that need protection; the courageous can usually protect themselves. Timid and inexperienced persons are particularly subject to threats, and it does not lie in the mouths of the unscrupulous to excuse their imposition on such persons on the ground of their victims' infirmities.

Restatement (Second) of Contracts § 175, comment c (1981). This is not to say, however, that a court cannot consider *reasonable* behavior as one factor in assessing whether a threat actually induced assent. *See id.* For instance, such consideration may be relevant in an assessment of the credibility of the victim's arguably self-serving testimony. In the Plaintiff's case, her susceptibility to the threat is credible, and reasonable given her limited educational background.

### c. Contract unfairness.

The requirement that a contract obtained by duress be "unfair" in order to be actionable forms a natural prerequisite

since the common law is loathe to "remedy" a situation devoid of injury. Here, the Plaintiff has not proven that the economic terms of the Consolidation Debt were unfair to her. In general, the consolidation and/or refinancing of existing debt on terms more favorable to a debtor is beneficial, not detrimental to that debtor. Nonetheless, under the unique circumstances of this proceeding the very creation of the Consolidation Debt, even on favorable economic terms, visited prejudice upon the Plaintiff.

The prejudice which is manifest in this proceeding is a deprivation of the Plaintiff's right to a bankruptcy discharge of the Original Debt. Simply put, the Plaintiff has established, *for the purposes of this adversary proceeding,*[7] that *but for* her assent to the creation of the Consolidation Debt she would have been able to receive a discharge of the Original Debt in the present bankruptcy case. The Plaintiff's claim to the dischargeability of the Original Debt is premised entirely on the putative fact that such debt "first became due more than 7 years ... before the date of the filing of [her bankruptcy] petition", within the meaning of 11 U.S.C. § 523(a)(8) (1996). The factual record of this proceeding supports such a claim, in that the Original Debt had been in repayment status for more than seven years at the time the Plaintiff–Debtor commenced the instant bankruptcy case.[8] The Plaintiff also concedes that the Consolidation Debt, if not avoided in this proceeding, is a nondischargeable student loan debt, which, to her detriment, restarted the seven-year clock of Section 523(a)(8) (1996). Under these circumstances, the duress-induced substitution of a non-dischargeable obligation (the Consolidation Debt) for a dis-

chargeable debt (the Original Debt) imposed undue prejudice upon the Plaintiff, and is thus "unfair" to her.

In sum, the Plaintiff has demonstrated by clear and convincing evidence that she assented to the creation of the Consolidation Debt, to her detriment, due to duress imposed by the Callers. Yet because of the unique posture of this proceeding, such proof is not alone sufficient to support the avoidability of the Consolidation Debt.

### 3. Third–Party Duress.

 Classically, and in the Connecticut authorities reviewed by the Court, the person accused of duress is also a party to the subject agreement. By contrast, the present record supports a finding that the Callers were not themselves parties to the Consolidation Debt. Although the Connecticut cases appear not to address this distinction, the Restatement of Contracts does provide some guidance. "If a party's manifestation of assent is induced by *one who is not a party to the transaction,* the contract is voidable by the victim unless the other party to the transaction *in good faith and without reason to know of the duress* either *gives value* or relies materially on the transaction." Restatement (Second) of Contracts § 175(2) (1981) (emphasis supplied).

As applied to the present adversary proceeding, this third-party duress rule (hereafter, the "Third–Party Duress Rule") provides no safe harbor for the Defendants. While the record amply supports the fact that the Consolidation Debt lender (AELMAC) gave value, *i.e.* it paid off the Original Debt, the record was silent on the question of AELMAC's good faith and/or knowledge of the Callers' illicit solicita-

---

7. This determination is neither intended, nor able, to bind entities not party to this proceeding.

8. *See* discussion at Section V.B. of this Memorandum of Decision.

tions. Since the burden rests with the Defendants to demonstrate their entitlement to the shelter of the Third–Party Duress Rule, the absence of evidence of good faith ignorance deprives the Defendants of the protection of that Rule. Yet, even if this Court were to find that AELMAC was in *bona fide* ignorance of the Threats at the time of the origination of the Consolidation Debt, the Court would still impute the conduct of the Callers to the Defendants.

 The Restatement makes clear that the Third–Party Duress Rule "does not ... protect a party to whom duress is attributable under the law of agency." Restatement (Second) of Contracts § 175, comment e (1981). The question thus becomes whether the Callers were agents of AELMAC with authority to solicit a consolidation loan from the Plaintiff. In this case, the law of agency, as applied to the facts adduced, supports a conclusion that the Callers' and Diversified were agents of AELMAC for the purpose of soliciting the Consolidation Debt from the Plaintiff.

Under principles of agency, a principal can be bound by the acts of another who is, or is deemed to be, his agent. Under Connecticut law an agency relationship is created by a principal either through advance authorization or subsequent ratification. In the instant proceeding the Plaintiff has not proven that the Callers had either actual or apparent advance authority as agents of AELMAC.[9] The record at trial was devoid of evidence that, prior to the Threats and the Plaintiff's eventual execution of the Note/Application, AELMAC identified the Callers or Diversified as its agent(s). The record reflects that as of those points in time the Plaintiff had received no communication from anyone who purported to be a principal of the Callers—who claimed only to be agents of the federal government and the Plaintiff's then-existing student loan lenders.

Despite the lack of proof as to advance authorization, the Court still concludes that at all relevant times Diversified and/or the Callers were acting as agents of AELMAC because the Plaintiff has proven, at a minimum, that AELMAC *ratified* their actions. "Ratification means the adoption by a person, as binding upon himself, of an act done in such relations that he may claim it as done for his benefit, although done under such circumstances as would not bind him except for his subsequent assent; as where an act was done by a stranger having at the time no authority to act as his agent, or by an agent not having adequate authority. The acceptance of the results of the act with an intent to ratify, and with full knowledge of all the material circumstances, is a ratification." *Hartford Acc. & Indem. Co. v. South Windsor Bank & Trust Co.*, 171 Conn. 63, 72, 368 A.2d 76 (1976) (*citing* 3 Am.Jur.2d, Agency § 160 and Restatement (Second) of Agency § 82).

Shortly after the Plaintiff's execution of the Note/Application, AELMAC identified itself as the lender on the Consolidation Debt, and thereupon accepted the benefits of that transaction, which had been solicited and documented for its benefit by Diversified and/or the Callers. "It is an established principle of the law of agency that where a person acts for another who *accepts or retains the benefits* or proceeds of his efforts with knowledge of the material facts surrounding the transaction, such other must be *deemed to have ratified the methods employed*, as he may not, even

---

9. The Court is not determining that there was in fact no advance authority; only that Plaintiff did not prove advance authority *at trial*.

though innocent, receive or retain the benefits of, and at the same time disclaim responsibility for, the measures by which they were acquired." 3 Am.Jur.2d Agency § 194 (1986) (emphasis supplied). Nor does a principal's ignorance of its agent's methodology absolve it from responsibility—"[i]f the agent procures a contract by fraudulent or corrupt practices, although the principal has not been privy in any way to such conduct of his agent, by claiming the benefit of the contract, the principal must take it tainted as it may be with such practices." *Id.*

Accordingly, the Plaintiff has established by clear and convincing evidence all elements of duress necessary for the voiding of the Consolidation Debt. An appropriate declaratory judgment shall enter on Count I of the Complaint.

## B. Count I—Dischargeability of Original Debt.

This Court assumes, without deciding, that the voiding of the Consolidation Debt pursuant to Count II of the Complaint revives or sustains the viability of the Original Debt for purposes of Count I of the Complaint.[10] Accordingly, the Court

turns now to a determination of Count I of the Complaint, which alleges that the student loan(s)[11] comprising the Original Debt "were subject to Discharge under 11 USC 523(a)(8) [ (1996) ], in that, they first became due more than seven (7) years prior to the filing [of the instant bankruptcy petition]."

On the record of *this* proceeding the Court finds and concludes that the Original Debt is dischargeable as to the present Defendants under the law applicable to this case, 11 U.S.C. § 523(a)(8) (1996).[12] The Plaintiff successfully met her burden[13] of demonstrating that the Original Debt first became due more than seven (7) years prior to the filing of the instant bankruptcy petition. The record established that not later than July, 1987, the Plaintiff withdrew from Barnell. Further, no trial evidence was introduced identifying any initial deferment or intermediate suspension of the repayment period on that obligation.[14] Consequently, the Court finds and concludes that the Original Debt first became due approximately nine (9) years prior to the Petition Date. Accordingly, the Plaintiff is entitled to a judgment declaring the dischargeability of

---

**10.** This assumption should not be construed as a conclusion that the Original Debt is revived for any particular holder thereof by virtue of the voiding of the Consolidation Debt.

**11.** The Plaintiff does not contest that the loans comprising the Original Debt were "educational" loans within the meaning of Code Section 523(a)(8).

**12.** Code Section 523 provided in relevant part, in 1996, as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any

program funded in whole or in part by a governmental unit or non-profit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless—

(A) such loan, benefit, scholarship, or stipend overpayment first became due more than 7 years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition ....

\* \* \* \* \* \*

**13.** The standard of proof in dischargeability actions under Code Section 523 is a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

**14.** On this question the creditor bears the burden of production.

the Original Debt as against (i) AELMAC by default,[15] and (ii) ECMC on the merits.[16]

## VI. CONCLUSION

Based upon the foregoing, judgment shall enter in this adversary proceeding, in favor of the Plaintiff on Counts I and II of her Complaint.

---

15. *See* fn. 1, *supra.*

16. However, by entering such judgment, the Court should not be understood to be finding and/or concluding (i) that the Original Debt is now extant, or (ii) if the Original Debt *is* extant, that declaratory judgments against the present Defendants are alone sufficient to effect fully the dischargeability of that debt as against all entities. The Court is merely entering the relief requested by the Plaintiff against the only entities made party-defendants in this proceeding. Further, the Court limits the judgment to declaratory relief since the Plaintiff did not request monetary relief, *e.g.*, a return of payments made on an obligation determined to be void *ab initio*.